## 39160. DUCK v. THE STATE.

GREGORY, Justice.

The defendant was convicted of the June 4, 1981 stabbing murder of Jayne Townes Autry and the aggravated assault of her eight-year-old daughter, Shammah Autry. He was sentenced to ten years imprisonment for the aggravated assault to run consecutively to the life sentence imposed for murder.[1] The evidence at trial showed the following:

James Massey, an employee at a Floyd County service station, testified that on June 2, 1981 the defendant, whom he had known in high school, drove a red Ford Pinto into his service station and requested directions to Moultrie Lane in the West Rome section. At this time the defendant, a member of the Marine Reserves, stated to Mr. Massey that his Marine sergeant had sent him "on an errand on Moultrie Lane." Sgt. Larry Doyle, the defendant's Marine Corps supervisor, testified, however, that he did not send the defendant out on any errands on Moultrie Lane during the month of June, 1981. At the time of the commission of the crime the victim resided in a small frame house on Moultrie Lane.

Marine Staff Sergeant Steve Land testified that he observed the defendant in the Marine Armory at approximately 9:10 p.m. on June 4, 1981. At this time the defendant was dressed in a "standard Marine camouflage uniform" and was engaged in a telephone conversation in which he appeared to be enjoying himself.

Two other witnesses testified that they observed a red Ford Pinto bearing a "National Guard-type license plate" parked at Daniels Funeral Home located in the victims' neighborhood at about 9:40 on the night of the murder. At trial Elizabeth Cagle, a neighbor of the victims, identified the defendant as the man she observed walking rapidly through the neighborhood at approximately 9:45 p.m. on June 4 as she drove into her driveway.

Pam Nixon, an employee at a convenience store located in the victims' neighborhood, testified that around 11:00 p.m. on June 4 Shammah Autry came running barefooted into the store, wearing

---

[1] The State sought the death penalty against the defendant. The jury was unable to reach a unanimous verdict during the sentencing phase of trial and the trial court sentenced the defendant to life imprisonment. All proceedings were conducted in accordance with the Unified Appeal Procedure.

what, at first glance, appeared to be a red nightgown. Mrs. Nixon quickly determined, however, that the child's white nightgown was completely soaked with blood. The child told Mrs. Nixon that she saw "someone cutting her mother" and gave her home address, her grandmother's phone number and requested that her grandmother be called. Mrs. Nixon testified that while Shammah had sustained numerous lacerations she was "alert, calm and cognizant of her surroundings." In Mrs. Nixon's presence Shammah identified her assailant as "Ron . . . He goes to our church . . . He even had on his army jacket . . . His wife just had a little baby."

Law enforcement officers from the Rome Police Department were subsequently contacted to investigate Shammah's report. Mrs. Autry's body was found lying in a large pool of blood in the kitchen of her home. She had sustained twenty-six stab wounds. The exercise suit she was wearing had been partially pulled down about her waist. Police investigators testified that the floor of Shammah's bedroom closet was "completely covered in blood" and that there was a trail of a child's bloody footprints leading from Shammah's bedroom to Mrs. Autry's bedside phone; this phone was also "covered in blood."

When police officers interviewed Shammah at the Floyd County Hospital, she again stated that she recognized her assailant as "Ron" who attended her church and pointed out that he had been wearing "army" or "jungle" type clothing. She informed the officers that Coach Paul Kennedy, another member of her church, would be able to tell them Ron's last name. Shammah stated that she knew the defendant from his work with AWANA's (Accomplished Workers Are Not Ashamed) at the West Rome Baptist Church. She explained that this was a youth organization of which she was a member and that the defendant had occasionally chaperoned this group on field trips.

When contacted by police Coach Kennedy immediately identified the defendant as the "only Ron [he knew] in army clothes." Police officers then proceeded to the defendant's home where they found a red Ford Pinto bearing a military reserve tag. The defendant was located inside his home, placed under arrest and given Miranda warnings. The defendant was not wearing a shirt at this time and officers observed a number of scratches on his left arm, abdomen and shoulder. The defendant stated to the officers that he had been home since "8:30 or 9:00 p.m." that evening. In a separate interview defendant's wife told police that defendant had returned home about 11:10 p.m. wearing a Marine Corps camouflage uniform. Police officers found camouflage clothing and a knife soaking in the washing machine at the defendant's home. Pursuant to a search warrant police searched the defendant's car and found a slip of paper with

Jayne Autry's name, phone number and address on it in the glove compartment.

The physician attending Shammah Autry testified that the child had suffered eight stab wounds, requiring twenty-two stitches to close. He testified that the child was "alert and oriented to person, place and time" following her assault. The medical examiner testified that Jayne Autry died as a result of twenty-five or twenty-six stab wounds "on all body surfaces . . . from head to toe." The wounds varied in depth from 1/2 inch to 3 1/2 inches.

Shammah Autry testified that shortly before the murder she and her mother were talking in her mother's bedroom. Shammah went into the kitchen to get something to drink and "heard a noise that sounded like footsteps." After relating this to her mother, Mrs. Autry went into the kitchen, but, apparently, observed nothing unusual. Shammah testified that when her mother later went into the kitchen, she immediately began screaming. At that point the child ran into the kitchen; she stated that her first impression was that the assailant was her mother's boyfriend and that the two were "playing a game" as the man had his back to her and appeared to be hugging her mother. When the assailant turned to face her, Shammah recognized him as a chaperone to her AWANA group. She also stated that she remembered on the previous Sunday in church she had witnessed the assailant and his wife "give their baby to God." Shammah testified that the defendant began stabbing her, but ceased when she kicked him in the shin. She then ran to her room and hid in the closet until "everything became quiet." Thereafter she attempted to call the police from her mother's bedroom, but realized the phone line had been cut. She went to a neighbor's house but was unable to rouse anyone. She testified that before she left her home to go to the convenience store, she turned her mother's head to see if she was still breathing. When she realized her mother was dead, she "kissed her goodbye on the lips."

In his defense the defendant offered the testimony of ten character witnesses as to his reputation in the community.

(1) Officer Greg Dickson testified for approximately two hours at trial. Part of this testimony on direct examination consisted of a lengthy narrative relating his actions from the time he was summoned to the scene of the crime to his interview of Shammah Autry, to the arrest and booking of the defendant at police headquarters. During this narrative Officer Dickson stated " . . . I went back to the police station and began paperwork. After I explained his rights to him, Ronald Duck asked that he be able to contact his attorney. A phone was made available to him, and he contacted his attorney at home. At this point I got a tape recorder and

went back to 209 Moultrie Lane and began interviewing witnesses and putting their testimony on tape . . ."

No objection was made to the statement that the defendant requested an attorney, nor was this reference enlarged upon during cross, re-direct or re-cross-examination of Officer Dickson. Following the conclusion of Officer Dickson's testimony, the State moved, out of the presence of the jury, to be allowed to go into the defendant's request for an attorney[2] and other statements made by defendant to police to show the defendant's mental awareness at the time of arrest since the defense had earlier announced its intention to rely on a defense of insanity. Both parties argued this issue before the trial court. Relying on *Williams v. State,* 242 Ga. 757 (3) (251 SE2d 254) (1978), the trial court granted the State's motion.[3] Defense counsel thereafter moved for a mistrial on the ground that Officer Dickson's testimony violated the defendant's Fifth Amendment right to remain silent. The trial court denied the motion.

We find defendant's Fifth Amendment rights were not violated by the admission of Officer Dickson's testimony. It is clear from our study of the transcript that this testimony did not focus on the defendant's silence or suggest that the defendant had asserted his right to remain silent. The testimony simply related, in the course of a lengthy narrative, that the defendant requested an attorney; it did not purport to be evidence of the defendant's guilt or to be directed toward undermining any of his defenses. Cf. Doyle v. Ohio, 426 U. S. 610 (96 SC 2240, 49 LE2d 91) (1976). The true focus of this court's inquiry must be whether the testimony produced a trial which was so fundamentally unfair as to deny defendant due process. *Smith v. State,* 244 Ga. 814, 815 (262 SE2d 116) (1979). "To reverse a conviction, the evidence of the defendant's election to remain silent must point directly at the substance of the defendant's defense or otherwise substantially prejudice the defendant in the eyes of the jury. No such situation exists here." *Cape v. State,* 246 Ga. 520, 523 (272 SE2d 487) (1980) cert. den. 449 U. S. 1134 (101 SC 956, 67 LE2d 121) (1981). See also, *Harrell v. State,* 249 Ga. 48 (288 SE2d 192) (1982).

(2)(a) Defendant next argues that the trial court erred in refusing to charge his three requests to charge on the law of insanity.

---

[2] The State was apparently unaware that Officer Dickson had already testified that the defendant requested an attorney following his arrest.

[3] However, other than Officer Dickson's testimony quoted herein, the State made no offer of any of defendant's statements to police. The State decided to withdraw this additional testimony after it was heard by the trial court outside the presence of the jury.

However, we agree with the trial court that the evidence did not raise this issue.

The defendant entered a plea of "not guilty" which, he correctly asserts, encompasses the defense of "not guilty by reason of insanity." *Gilbert v. State,* 235 Ga. 501 (220 SE2d 262) (1975). However, the evidence shows only that the defendant "was slow, but could complete any job," and that he stated to police officers he had a "45 minute lapse of memory from the time [he] left the [Marine] Armory until [he] got home." Without more such evidence does not require the trial court to charge the law on insanity. *Reeves v. State,* 234 Ga. 896, 898 (218 SE2d 625) (1975), overruled on other grounds in 239 Ga. 40 (1977). The appropriate test of mental capacity is whether the accused is capable of distinguishing between right and wrong at the time of the commission of the offense. OCGA § 16-3-2 (Code Ann. § 26-702).

Relying on *Brown v. State,* 228 Ga. 215, 219 (184 SE2d 655) (1971), defendant maintains that the trial court erred in refusing to charge the jury that "the act itself may be so utterly senseless and abnormal as to furnish satisfactory proof of a diseased mind to warrant a finding of insanity on the part of the defendant." *Brown* is, however, factually distinguishable from this case. Further, we note that in *Brown* there was "expert testimony . . . which would have authorized the jury to find that the defendant was suffering from delusional insanity." 228 Ga. at 216.

(b) Without citation of authority defendant argues that it was error for the trial court to deny his request for an independent psychiatric evaluation.[4] In the absence of a special plea of insanity, an accused's request for a psychiatric evaluation lies within the sound discretion of the trial court. The trial court's ruling will not be interfered with absent a showing of abuse of that discretion which defendant has failed to do in this case.

(3) Defendant argues the trial court erred in refusing to strike the in-court identification testimony of Elizabeth Cagle, a neighbor of the victims. At trial Miss Cagle testified that on the evening of June 4, 1981 she and her sister had been visiting some friends, returning home at approximately 9:45 p.m. Miss Cagle testified that as she approached her driveway she noticed a man in the driveway next to

---

[4] The record indicates that defendant's trial was initially set for January 18, 1982. The defendant's motion for a continuance of trial was granted and on February 3, 1982 he filed a petition for psychiatric examination. This petition was granted and defendant was examined by the staff at Northwest Georgia Regional Hospital. Trial was rescheduled for February 15, 1982 at which time defendant moved for a second continuance and an independent psychiatric examination.

her house, walking rapidly toward the street. She slowed her car down to allow the man to cross the street. Miss Cagle stated that she examined the man closely as she was expecting an air conditioning repairman to come by, but realized the pedestrian was not the repairman when she observed he was wearing "army fatigues." She stated that the man walked in front of her stopped car and she was able to observe him under a street light. She noticed that he wore glasses and had neatly trimmed dark hair; before she turned into her driveway she saw him get in a "small red car" parked at Daniels Funeral Home.

Miss Cagle testified that she attended the defendant's preliminary hearing at a neighbor's request. When she observed the defendant walk to the bench she recognized the defendant as the man she had seen near her home the night of the murder. She then made this information known to law enforcement officials. At trial Miss Cagle testified that it was the defendant's "distinctive stride" which caused her to recognize him; Miss Cagle also expressed her belief that her many years as a social worker had helped her to become a "trained observer and listener" who always paid close attention to detail.

Defendant made no objection to Miss Cagle's in-court identification until four days after she testified. Relying on *Bradley v. State,* 148 Ga. App. 722 (252 SE2d 648) (1979), defendant argues that his "confrontation" with Miss Cagle at the arraignment was impermissibly suggestive, resulting in a substantial likelihood of a mistaken-in-court identification. We do not agree.

In *Bradley* law enforcement officers summoned the witness to the preliminary hearing "for the express purpose of testifying against [the accused], yet no precautions were taken to insure the integrity of the identification process." 148 Ga. App. at 723.

However, in this case the police played no role in Miss Cagle's identification of the defendant at the preliminary hearing. Miss Cagle did not attend the hearing at the behest of law enforcement officers nor was she asked to identify the defendant at this time. She attended the preliminary hearing by choice and, realizing that the defendant was a man she had seen in her neighborhood on the night of the murder, related this information to the police. "The issue here is not the possible taint of identification due to suggestive pre-trial procedures, but, rather the credibility of eyewitnesses to the incident. The due process protection of the Fourteenth Amendment to the United States Constitution protects the citizens against state action rather than against citizen action. In order for the Fourteenth Amendment to come into play in an identification procedure, state action must be involved." *Lyons v. State,* 247 Ga. 465, 467 (277 SE2d

244) (1981). See also *McClesky v. State,* 245 Ga. 108 (263 SE2d 146) (1980). Issues regarding the credibility of witnesses are to be resolved by the trier of fact. *Young v. State,* 232 Ga. 176 (205 SE2d 307) (1974). However, we point out that Miss Cagle had ample opportunity to view the defendant in a lighted area, that her attention was well focused on the defendant and that she confidently testified she had seen the defendant in her neighborhood on the night of the murder. Under these circumstances we do not find that there was a substantial likelihood of an in-court misidentification. See Neil v. Biggers, 409 U. S. 188, 199-200 (93 SC 375, 34 LE2d 401) (1972).

(4) Last defendant argues that the trial court erred in denying his motion in limine to exclude the testimony of Beth Dempsey. Miss Dempsey, a waitress at the Country Kitchen Restaurant, testified that she had met the defendant a few days prior to the murder while she was working in the restaurant. He obtained her phone number and began calling her several times a day, asking her to go out with him. The defendant informed the witness that he was a Marine who resided with his parents; he did not tell her he was married. On the night of the murder the defendant again telephoned the witness at approximately 8:45 p. m. He informed her he was still at the Marine Armory and repeatedly requested that she come there "to sit with [him]." The defendant spoke to the witness for 35-45 minutes, suggesting excuses she might use to obtain permission to leave her aunt's house. After the witness refused to meet him, the defendant ended their telephone conversation at about 9:30.

The defendant argues that this testimony was not relevant to the issues in the case and, further, that it had the effect of putting his character in evidence.

We find, however, this testimony supports the inference that the defendant was the perpetrator of the crimes. The testimony was relevant to the question of identity, as it placed the defendant on duty at the Marine Armory where he would have been required to wear, as substantiated by the testimony of Sgt. Land, "a standard Marine uniform," at a time shortly before the commission of the murder. Further Miss Dempsey's testimony was admissible to impeach the defendant's statement to police that he had been in his home since "8:30 or 9:00 p.m."

Evidence relevant to an issue in the case is not rendered inadmissible because it may incidentally impugn the character of an accused where character is not otherwise in issue. *Whippler v. State,* 218 Ga. 198, 200 (126 SE2d 744) (1962); Agnor's Georgia Evidence, "Relevancy," § 10-5 (1976).

*Judgment affirmed. All the Justices concur.*

DECIDED FEBRUARY 3, 1983 —
REHEARING DENIED FEBRUARY 22, 1983.

*Jack R. Hancock,* for appellant.
*F. Larry Salmon,* District Attorney, *Stephen F. Lanier,*
Assistant District Attorney, *Michael J. Bowers,* Attorney General,
*Janice G. Hildenbrand,* Staff Assistant Attorney General, for appellee.