S03A0376. ROWE v. THE STATE.
(582 SE2d 119)

Hines, Justice.

Clayton Rowe appeals his conviction for malice murder in connection with the fatal shooting of his wife, Bobbie Lynn Rowe. He challenges the admission of certain testimony and other evidence, the restriction of cross-examination, and the refusal to allow him to call an alleged newly discovered exculpatory witness. Finding the challenges to be without merit, we affirm.[1]

The evidence construed in favor of the verdicts showed that in the early morning hours of November 20, 2001, Clayton Rowe ("Rowe") telephoned 911 and stated that he had shot his wife, Bobbie Lynn Rowe. Corporal Sanders of the Garden City Police Department responded to the reported shooting at the Rowe home; he found Mrs. Rowe in the "t.v. room" with a bullet wound to the right side of her head, unconscious, and gasping for air. Sanders saw two handguns, a magazine, and a holster on a nearby coffee table. Empty champagne bottles were found. The home was neat and tidy except for the gun cabinet which was in disarray; the cabinet appeared to have been "yanked open." Rowe was visibly upset, and there was blood on his forehead, wrist, and hands. Mrs. Rowe was transported by emergency personnel to a hospital, where she died on November 25, 2001. She had sustained a "near contact" wound to the head, meaning that the weapon was approximately one centimeter away from her when

---

[1] The shooting occurred on November 20, 2001. On March 27, 2002, a Chatham County grand jury indicted Rowe for malice murder, aggravated assault, and felony murder while in the commission of aggravated assault. He was tried before a jury July 22-26, 2002, and found guilty of all charges. On July 26, 2002, Rowe was sentenced to life imprisonment for malice murder; the trial court found that the aggravated assault merged for the purpose of sentencing, and the felony murder stood vacated by operation of law. See *Malcolm v. State,* 263 Ga. 369, 371-372 (4) (434 SE2d 479) (1993). An amended sentence providing for the same punishment was later entered on October 24, 2002. A notice of appeal was filed on August 22, 2002, and the case was docketed in this Court on November 14, 2002. The appeal was argued orally on March 11, 2003.

the wound was inflicted.

Rowe was arrested at the scene and taken to the police station, where he gave a videotaped interview to Detectives Gunno and Stratman; Rowe stated that he and his wife had been drinking champagne, that the handguns were out of the cabinet because he was showing them to his wife, that they "both went for" the Rossi .38 caliber special revolver, and that it fired accidentally.

The .38 caliber revolver was seized at the scene and turned over to the state crime lab for analysis. A firearms examiner with the Georgia Bureau of Investigation tested the handgun and determined that it could fire, and that the hammer safety was working as designed. He concluded that the pistol could not go off accidentally, and pulling the trigger was the only way to fire it. It took approximately five pounds of pressure to pull the trigger in the single action, and 13½ pounds of pressure to pull the trigger in the double action.

The examiner also tested the clothing worn by Rowe on the night of the shooting, and found no gunpowder; however, the examiner explained that one would not expect to find gunpowder on the shooter's clothing because when a weapon discharges the gunpowder travels in a forward direction with the bullet.

Officer Chris Findley, supervisor of the Crime Scene Unit of the Garden City Police Department, testified concerning the reconstruction of the crime scene. The angle and trajectory of the bullet showed that when the shot was fired, Mrs. Rowe was looking at the television; she was not looking at the table retrieving the handgun, as claimed by her husband. Findley also saw blood and human hair on the weapon, and from his attendance at Mrs. Rowe's autopsy, he observed that she had no type of injury to her hands; there was no cylinder or muzzle blast. If Mrs. Rowe had been holding the handgun by the barrel when it was fired as her husband claimed, she would have had cylinder or muzzle blast on her hands.

Mrs. Rowe's sister, Melanie Bryant, testified that she had a "very close" relationship with Mrs. Rowe, that the two talked with each other on nearly a daily basis, sometimes twice a day. Bryant was aware that her sister and Rowe had problems with alcohol. On one occasion, Mrs. Rowe moved in with Bryant after the Rowes had "an ordeal" that involved alcohol. Bryant "never really cared for the way" Rowe treated her sister. She described Rowe as a "very controlling" man with a "snappy temper," who "beat [Mrs. Rowe] down verbally."

Mrs. Rowe's lifelong friend, Amanda Simmons, regularly kept in contact with her. Mrs. Rowe confided to Simmons that she and Rowe "fought a lot." Ten to twelve years before the fatal shooting, Simmons arrived at the victim's home shortly after the victim and Rowe had a fight. There was evidence of a struggle, including an overturned lamp and pillows on the floor. Mrs. Rowe's arm was bruised and she had

red marks around her neck and collar bone. She told Simmons that Rowe had hit her.

At trial, Rowe testified that: on the evening of the shooting he and his wife were drinking champagne, even though he was an alcoholic and his wife also had a problem with alcohol; after several hours of drinking, Rowe retrieved .45 and .38 caliber pistols from the gun cabinet; at his wife's request, Rowe instructed her on how to put a clip in and take it out of a .22 caliber pistol and make it safe; Mrs. Rowe reached toward the coffee table to pick up the loaded .38 caliber pistol by the barrel; fearing that the pistol would fall and break the glass table, Rowe also leaned forward to grab it; and the pistol discharged, striking Mrs. Rowe in the head. Rowe could not explain how the pistol discharged; he "speculated" that he "leaned out, bumped the back of the gun and her finger was inside the trigger guard" or "my hand, when I leaned out and we had the dog between us, we either raised up and my finger was in the trigger guard and her pulling on the gun discharged the weapon."

1. The evidence was sufficient to enable a rational trier of fact to find Rowe guilty beyond a reasonable doubt of the malice murder of his wife. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

2. Citing *Yancey v. State*, 275 Ga. 550 (570 SE2d 269) (2002), and *Barksdale v. State*, 265 Ga. 9 (453 SE2d 2) (1995), Rowe contends that his Sixth Amendment right of confrontation was abridged by the introduction of the portion of his videotape interview with police that included what he characterizes as "editorial" statements by Detective Stratman constituting hearsay. But the contention is unavailing.

Following a *Jackson v. Denno*[2] hearing, the trial court ruled that Rowe's videotape statements to Detective Gunno were admissible, but granted Rowe's motion to exclude that portion of the videotape interview involving his exchange with Detective Stratman. The court excluded it on the basis that Stratman was not available to be called as a witness at trial. Accordingly, the videotaped interview was played for the jury during the State's case in chief, but it was stopped at the point when Stratman entered the interview room. However, on direct examination, defense counsel questioned Rowe about whether he had been interviewed by another detective in addition to Gunno, and whether he had been asked if Mrs. Rowe had committed suicide.[3]

---

[2] 378 U. S. 368 (84 SC 1774, 12 LE2d 908) (1964).

[3] Defense Counsel: Were you interviewed by Detective Gunno the following day?
Rowe: Yes, I was.
Defense Counsel: Were you interviewed by another detective as well?
Rowe: Yes, I was.
Defense Counsel: From the time that gun went off until your interview, had . . . had you been asleep at all that . . . in that early morning?

Following a sidebar conference, the trial court granted the State's request to play for the jury the remainder of the videotape because the defense had "opened the door" by going into the fact and substance of the interview with Stratman.

Rowe asserts that his counsel posed only a few narrowly drawn questions; therefore, the trial court erred in finding that he "opened the door" to the entire portion of the interview with Stratman. But the questions posed by defense counsel in the context of the interview demonstrate the fallacy of such assertion. The defense questions focused on the substance of the interview with Stratman regarding any possibility that Mrs. Rowe's death was a suicide, and examination of the interview shows that Stratman's questions about suicide and Rowe's responses occurred throughout the exchange. Consequently, it would not have been possible to isolate the comments about suicide from the rest of the interview.

But Rowe's challenge fails for a more basic reason. Cases such as *Yancey v. State*, supra, and *Barksdale v. State*, supra, on which Rowe relies are factually inapposite. Such cases address the propriety of the admission of hearsay statements inculpatory to the defendant when the hearsay declarant does not testify at trial.[4] What Rowe characterizes as inadmissible statements by Stratman regarding his theory of the case was nothing more than police questioning aimed at eliciting responses from a defendant in custody. The exchange with Stratman did not rest mainly on the veracity and competency of other persons and was not offered by the State in order to prove the truth of Stratman's provocative questioning. OCGA § 24-3-1; *Head v. State*, 276 Ga. 131, 134 (3) (575 SE2d 883) (2003). Nor were Stratman's comments used as a vehicle for relating inculpatory statements or information from another individual. Compare *Ehle v. State*, 275 Ga. 560, 561 (3) (570 SE2d 284) (2002); *Dixon v. State*, 275 Ga. 232, 233 (3) (564 SE2d 198) (2002). Even assuming arguendo that Stratman's portion of the exchange with Rowe is properly cast as hearsay, and violative of his right of confrontation under the anal-

---

Rowe: No, sir.
Defense Counsel: Did the police ask you whether Bobbie had committed suicide?
Rowe: Yes, they did.
Defense Counsel: Did they ask you that on more than one occasion?
Rowe: Uh-huh, several.
Defense Counsel: And what did you tell them?
Rowe: I told 'em that Bobbie Lynn loved life too much to wanna do that.
Defense Counsel: Did you tell them that on each occasion?
Rowe: Yes, I did.

[4] *Yancey v. State*, supra, involved the question of whether a statement inculpating the defendant made by a suspect during an official police investigation has sufficient indicia of reliability to be admissible when the declarant does not testify at trial; *Barksdale v. State*, supra, involved hearsay statements of a co-indictee.

ysis in *Yancey v. State*, supra, that would not end the inquiry. "Whether a constitutional violation constitutes harmless error depends on whether the [S]tate can prove beyond a reasonable doubt that the error did not contribute to the verdict . . . the test is whether 'there is a reasonable possibility that the improperly admitted evidence contributed to the conviction.' " Id. at 557 (3). And it must be concluded in this case that it did not. Any comments by Stratman about the possibility of suicide were favorable to Rowe on the issue of criminal culpability. As for questioning by Stratman focusing on Rowe as the intentional shooter because of any asserted physical evidence, the jury had before it expert forensic testimony and substantial other evidence regarding the physical circumstances surrounding the killing.

3. Rowe next contends that his Sixth Amendment right to cross-examine Detective Gunno was abridged when the trial court limited questioning on cross-examination about Detective Stratman's portion of the interview with Rowe. He complains that he was denied the opportunity to question Gunno about Stratman's comments that the wound inflicted upon Mrs. Rowe was a contact wound and about gunpowder tattooing and burns present on her; he further urges that he should have been allowed to question Gunno about how Stratman formed his opinions and impressions.[5]

Although a defendant has the right to a thorough and sifting cross-examination, the trial court has broad discretion to determine its scope. OCGA § 24-9-64; *Kolokouris v. State*, 271 Ga. 597, 600 (4) (523 SE2d 311) (1999); *Johnson v. State*, 270 Ga. 234, 235 (2) (507 SE2d 737) (1998). That discretion will not be disturbed on appeal

---

[5] The following colloquy occurred between defense counsel and Detective Gunno prior to the State's initial objection:

Counsel: And are you familiar with what Stratman was telling Mr. Rowe on that afternoon?

Gunno: I do recall hearing what Detective Stratman said, yes, sir.

Counsel: And you're not telling this jury as you sit there under oath that those things he was telling Mr. Rowe were entirely true, are you?

Gunno: I still don't understand your question, sir.

Counsel: Okay. Let's . . . let's . . . you remember [Detective Stratman] saying . . . or do you remember him saying in reference to what happens when you put . . . you heard him say it was a contact wound, didn't you?

Gunno: I recall him saying that, yes, sir.

Counsel: [Detective Stratman] didn't say it was a near contact wound, did he?

Gunno: I don't remember that being said.

Counsel: He didn't say it was a close contact wound, did he?

The trial court sustained the State's objection, finding that the questioning was an improper way to attempt to impeach the witness; the court stated that the defense could replay the videotape for the jury if it chose to. Defense counsel then asked, "It's safe to say that Mr. Stratman, based upon your experience with this investigation, formed impressions early on, is that correct?" The trial court sustained the State's objection, stating that the witness could not comment on the mental state of another person.

unless it has been abused. *Bromley v. State*, 259 Ga. 377, 382 (7) (380 SE2d 694) (1989); *Chastain v. State*, 257 Ga. 54, 55 (354 SE2d 421) (1987). What is more, a trial court is to preclude questions on matters that are not within the witness's knowledge. *Haralson v. State*, 234 Ga. 406, 407 (2) (216 SE2d 304) (1975).

It is plain that the trial court did not abuse its discretion in prohibiting the questions at issue. Any inquiry about how Detective Stratman formed his opinions and impressions were matters beyond Gunno's knowledge. As for questions regarding Stratman's interview comments about the physical evidence in the case, the jury was able to hear the interview for itself and to assess any statements by Stratman in light of the forensic evidence admitted at trial. See Division 2, supra.

4. Detective Stratman's interview with Rowe was terminated when Rowe requested an attorney.[6] Rowe contends that the trial court committed reversible error in admitting the portion of the interview tape where he invoked his right to counsel because this was an improper comment on his right to remain silent. But admission of the videotape ending with Rowe's request for an attorney did not amount to an improper comment on his right to remain silent warranting the reversal of his conviction. Compare *Mallory v. State*, 261 Ga. 625, 629 (5) (409 SE2d 839) (1991),[7] and *Hill v. State*, 250 Ga. 277 (295 SE2d 518) (1982), cited by Rowe.

Even though the defense objected to the playing of the portion of the videotape involving Stratman, it did not request that the videotape be stopped prior to Rowe's request for counsel. More significantly, the videotape merely shows that Rowe invoked his right to an attorney after giving a lengthy statement to police, and that the interview was then properly terminated. It did not purport to be evidence of Rowe's guilt nor was it directed to undermining any of his defenses. *Duck v. State*, 250 Ga. 592, 595 (1) (300 SE2d 121) (1983). Rowe's Fifth Amendment rights were not violated. Id.

Also, any complaint by Rowe that the trial court erred in failing

---

[6] Rowe: But my point is . . . I don't know, because I am so naive, whether I should even have a lawyer or not, the way you're talkin'.
Stratman: Well, sir, if you want –
Rowe: I can't afford a lawyer.
Stratman: May I ask you this, you read . . . you heard your rights. If you want an attorney and you tell me you want an attorney, then we will terminate the interview and we will get you an attorney, okay.
Rowe: Okay.
Stratman: 'Cause once you tell me . . . once you tell me you want an attorney, I'm not gon' violate your rights. Do you want an attorney?
Rowe: Sure, 'cause I can't talk to you.
[7] *Mallory's* implicit overruling on other grounds was recognized in *Clark v. State*, 271 Ga. 6, 10 (5) (515 SE2d 155) (1999).

to give curative instructions regarding his request for counsel is unavailing. He did not request any such instruction. *Pye v. State*, 269 Ga. 779, 785 (9) (505 SE2d 4) (1998). See also *Morris v. State*, 167 Ga. App. 351 (1) (306 SE2d 409) (1983).

5. Rowe contends that the trial court erred in allowing Mrs. Rowe's friend Simmons to testify about prior difficulties between the Rowes because it was inadmissible hearsay, the testimony lacked particularized guarantees of trustworthiness, and the previous incident was too remote in time.

First, much of Simmons's testimony did not involve the relating of any information from Mrs. Rowe; it was her own observation of the scene of the struggle and of Mrs. Rowe's injuries. When a defendant is accused of a criminal act against the victim, evidence of the defendant's prior acts toward the victim is admissible. *Wall v. State*, 269 Ga. 506, 509 (2) (500 SE2d 904) (1998).

As to Simmons relating that Mrs. Rowe confided to her that she and the defendant often fought and that he had hit her, such testimony was admissible under the necessity exception to the hearsay rule. In order to admit a statement out of necessity, the declarant must be unavailable, there must be particular guarantees of trustworthiness, and the statement must be shown to be relevant to a material fact and more probative of that material fact than other evidence that might be procured and offered. *Chapel v. State*, 270 Ga. 151, 155 (4) (510 SE2d 802) (1998). Mrs. Rowe was deceased, thus unavailable, and there were guarantees of trustworthiness. Simmons and the decedent shared a lifelong friendship, kept in contact, and confided in each other. See *Ward v. State*, 271 Ga. 648, 649 (2) (520 SE2d 205) (1999). Moreover, there was no apparent motive for Mrs. Rowe to lie to her friend, and Simmons arrived on the scene right after the fight and saw for herself evidence of the altercation. Finally, this evidence was relevant to the question of Rowe's aggressiveness and violence toward the victim during a time when the couple was drinking alcohol and more probative of that material fact than other evidence that might be procured and offered.

As to the fact that the incident occurred ten to twelve years before the victim's death, such a lapse did not render the evidence inadmissible as a matter of law. *Simmons v. State*, 266 Ga. 223, 225 (2) (b) (466 SE2d 205) (1996), overruled on other grounds, *Wall v. State*, supra. Rather the time lapse goes to the weight and credibility to be given the testimony, not its admissibility. Id.

6. Rowe next contends that the trial court erred in allowing Officer Chris Findley to testify regarding matters beyond his expertise, namely crime scene reconstruction and bullet trajectory. But the contention is unavailing.

As Rowe asserts, crime scene reconstruction and testimony con-

cerning bullet trajectory have been recognized as areas of expertise. *Brannan v. State*, 275 Ga. 70, 74 (c) (561 SE2d 414) (2002); *Speed v. State*, 270 Ga. 688, 692 (17) (512 SE2d 896) (1999). However, formal education in the particular subject is not a prerequisite for status as an expert; a person may be qualified as an expert when the person's knowledge is derived from experience as well as study. *Taylor v. State*, 261 Ga. 287, 290 (1) (a) (404 SE2d 255) (1991). Findley had been in law enforcement since 1994; he was certified as an ID technician; he had received training in crime scene reconstruction and bullet trajectory; he attended an advanced reconstruction workshop; and he was an instructor at the police academy in crime scene processing.

Findley was allowed to testify as to what he did and observed at the crime scene; as to any opinion testimony, it was given after an explanation of the facts upon which it was based, and it was a matter for the jury to weigh. *McGhee v. State*, 253 Ga. 278, 280 (5) (319 SE2d 836) (1984).[8] See also *Cammon v. State*, 269 Ga. 470, 471 (3) (500 SE2d 329) (1998).

7. During the investigation, the Georgia State Crime Lab conducted a blood alcohol test on Rowe, and a report was prepared prior to trial; however, Rowe apparently did not become aware of the existence of the report until after the trial had begun. Rowe contends that the trial court erred in refusing to allow him to call the forensic toxicologist as a newly discovered exculpatory witness to testify about Rowe's blood alcohol level, despite the relevance of the evidence and the fact that the State had not met its disclosure obligations. He urges that this resulted in the exclusion of information that was material and necessary to his defense.

However, the witness that Rowe sought to call was not an exculpatory witness. Voluntary intoxication is not an excuse for a criminal act. OCGA § 16-3-4 (c). Thus, the fact that Rowe was intoxicated would not shield him from criminal liability. Even assuming arguendo that such evidence would have supported Rowe's story that the shooting was accidental, there was ample evidence that Rowe had been drinking heavily the night of the shooting; he admitted to it and empty champagne bottles were found at the crime scene. Therefore, testimony of the crime lab expert about Rowe's intoxication would have been merely cumulative of other undisputed evidence presented at trial. *Smith v. State*, 237 Ga. App. 582, 584 (2) (516 SE2d 92) (1999).

8. Lastly, Rowe fails in his contention that it was error to admit State's Exhibit #78, a staged photograph attempting to show the tra-

---

[8] Rowe also asserts that Findley was called as a witness only because another witness could not be called; however, this has no bearing on the propriety of Findley's testimony.

jectory of the fatal bullet. The photograph was admissible as a demonstrative aid. *Grier v. State*, 273 Ga. 363, 366 (4) (541 SE2d 369) (2001). Furthermore, it was established during the cross-examination of Officer Chris Findley that the stance of the police officer in the photograph, which Rowe characterizes as aggressive, was not suggestive of the stance that Rowe had at the time of the shooting. See *Veal v. State*, 242 Ga. App. 873, 876 (4) (531 SE2d 422) (2000). The trial court did not abuse its discretion in admitting State's Exhibit #78. Id.

*Judgment affirmed. All the Justices concur.*

DECIDED JUNE 9, 2003 —
RECONSIDERATION DENIED JULY 11, 2003.

*Oliver, Maner & Gray, Harry D. Dixon, Jr., Gillen, Cromwell & Withers, Thomas A. Withers,* for appellant.

*Spencer Lawton, Jr., District Attorney, Nancy G. Smith, Assistant District Attorney, Thurbert E. Baker, Attorney General, Jill M. Zubler, Assistant Attorney General,* for appellee.