S06A1266. RICHARD v. THE STATE.
(637 SE2d 406)

HINES, Justice.

Curley James Richard appeals his convictions for malice murder and aggravated assault in connection with the death of Eric Sean Cole. For the reasons that follow, we affirm.[1]

Construed to support the verdicts, the evidence showed that Cole was found dead in a motel room. His body was face down, and his shorts were down around his knees, exposing his buttocks. The room was disheveled and there was blood on the floor and walls. Cole's personal belongings had been removed and the room appeared to have been wiped down to remove fingerprints; there was no forced entry. Cole died from a combination of blunt head trauma and

---

[1] Cole was killed on January 14, 2001. On May 23, 2002, a Cobb County grand jury indicted Richard and James Edward Cooper for malice murder, felony murder while in the commission of aggravated assault, aggravated assault by beating and strangling Cole with a weapon, aggravated assault by cutting Cole with a weapon, and armed robbery. Richard was tried alone before a jury on January 14-20, 2004, and found not guilty of armed robbery, but guilty of all other charges. On January 20, 2004, Richard was sentenced to life in prison for malice murder and a concurrent term of 20 years in prison for aggravated assault by cutting Cole with a weapon; the charge of aggravated assault by beating and strangling Cole with a weapon merged with the murder charge and the felony murder stood vacated by operation of law. See *Malcolm v. State,* 263 Ga. 369, 372-374 (4), (5) (434 SE2d 479) (1993). Richard moved for a new trial on January 21, 2004, and amended his motion on November 21, 2005. The amended motion was denied on February 7, 2006. Richard filed his notice of appeal on March 6, 2006, the appeal was docketed in this Court on April 4, 2006, and orally argued on June 12, 2006.

strangulation by the assailant's hands; he had also been stabbed. His body bore signs of a struggle, and some of the acrylic fingernails he wore had been broken.

In the hours before his death Cole, who was known to many as "M & M," drove a green Infiniti automobile with New Jersey license plates. Two days earlier, Colene Wilson ("Wilson") had lent her green Infiniti having New Jersey license plates to a man she knew as "M," Mark, or "Master Barber," who matched Cole's description. Wilson reported the car stolen when it was not returned to her. The car was stopped by police a week after Cole's murder. It was driven by a man who had obtained it from a man named Cooper, who was indicted with Richard. Further inquiry into the car's history led police to Richard.

Before his arrest, Richard was staying at the home of Bobby Brown ("Brown"), Cooper's brother. Richard told Brown that he had killed a man; Brown then told him to leave. Under cross-examination, Brown stated that he did not tell police what Richard had said when they asked him if he knew about Cole's murder, rather he told them he did not know anything about it; he also testified that "I still don't" know anything about the murder. He further testified that in response to police questioning, he told an investigating officer that he "knew about murders, friends of mine."

A few days after Cole's death, Richard asked Charles Johnson to drive him to Atlanta in Wilson's green Infiniti, and displayed the key to it. Richard told Johnson that he did not own the car, that it belonged to someone who owed him money. Johnson declined to drive the car. Johnson asked Richard if he had anything to do with Cole's murder, and Richard did not respond to the question. Richard also tried to sell the green Infiniti to Chanel Shepard; she refused to buy it.

Richard was arrested at Shepard's apartment. He was there to have his hair cut, which was unusual for him; he had for years worn it long and braided, but said it was time for a change. His hair was cut short, greatly altering his appearance. Police staked out the apartment before the arrest. Shepard noticed unknown men outside the apartment; Richard paced back and forth to the window, looking out. When the police knocked and asked Shepard to have Richard come out with his hands up, she sought Richard and found him seated on a bed, crying with his head in his hands.

Richard gave a statement to the police and said that he had not been to the motel where Cole was killed. Later, he admitted that he had gone there to sell Cole "some dope," describing him as "a gay dude." At first, Richard denied any knowledge of the Infiniti, then said that a man named "V" had approached him about the car "wanting a chop shop"; Richard initially denied having the key to the car, but later admitted that he did. Three days after the interview,

while Richard was being escorted back to his cell, he stated: "I know I'm going to have to do some time, but I'll get out."

At trial, the State called Joseph Ricky Hampton ("Hampton") to testify. Hampton at first refused to do so, asserting his Fifth Amendment privilege. He then said he did not want to testify and, if need be, would be held in contempt. After consultation with his counsel, Hampton testified that he had given a detective a statement relating what Richard had told him about killing "the gay guy at the motel," but had done so only because the detective told him he would release Hampton's brother from custody if he did so, and that he and the detective fabricated a story that Hampton then related on videotape under the detective's questioning. He also testified that the detective asked him about "another fella that was involved, James Cooper." At the time of trial, Hampton was incarcerated in the Cobb County jail, but testified he was housed on the other side of it and away from Richard.

The videotape of the police interview with Hampton was played for the jury. In it, Hampton said that: he had information concerning the murder at the motel; he understood that no promises or deals were offered in exchange for his participation in the interview; he was in the county jail while Richard was there[2] and spoke with him through jail pod doors. Hampton further related that Richard told him that: he was in jail because the police believed he killed a "punk"; he "f___d up that punk"; if people in jail bothered him, he would do them "like I did that punk," "with these hands," gesturing as though he was choking someone;[3] he and Cooper beat the victim with their fists, despite the police's belief that they used some object; Cooper held the victim while he stabbed him in the chest and head, cut his throat, and tore his fingernails; he "killed that punk" because he had given him a disease through homosexual activity; he took the victim's car and left; and Hampton should not speak to anyone about this. Richard asked Hampton what he thought about the chances of his being convicted if the police did not have the knife which was used to stab Cole. Finally, Hampton said that while they were in jail, he had also spoken with Cooper, who asked what Richard had talked about; indicated that he felt as though he had been "dragged into something he didn't do"; and told Hampton "I'll put a hit on him." The detective who conducted the interview testified that: Hampton approached him saying he had information about Cole's murder; Hampton participated in the interview freely; there was no agreement to dismiss

---

[2] Hampton was released from custody shortly before participating in this interview.

[3] The fact that Cole had been manually strangled had not been made known to the public.

any charges against Hampton's brother; and the detective did not have the authority to dismiss charges.

An audiotape of an interview with Brenda Brown ("Brenda"), made while she was in custody in Ohio on charges stemming from another homicide, was played for the jury; at the time of trial, Brenda could not be located and did not testify. In that interview, she said that Richard told her that: he killed a man, whom he described as gay, at a motel; he choked the victim, gesturing with his hands; he also stabbed the victim; and he showed her a green Infiniti automobile with New Jersey tags, saying "this is the man's car," and that he needed to hide the car or sell it to a "chop shop." She also related that Richard became angry when she told him that she had repeated what he said to a mutual friend. Also introduced into evidence was Brenda's written statement to the same effect as the information that she gave in the interview.

1. Brenda's statement and the audiotape of her interview were admitted under the necessity exception to the bar against hearsay testimony. See OCGA § 24-3-1 (b); *Parks v. State*, 275 Ga. 320, 322 (2) (565 SE2d 447) (2002). Richard asserts that the admission of this evidence violated his right to confront witnesses against him guaranteed by the Sixth Amendment to the Constitution of the United States. The opinion of the United States Supreme Court in *Crawford v. Washington*, 541 U. S. 36 (124 SC 1354, 158 LE2d 177) (2004), declares that a testimonial out-of-court interview such as the one at issue is inadmissible because it violates the Federal Constitution's Confrontation Clause. *Crawford* applies to cases pending on direct review at the time it was issued. See *Gay v. State*, 279 Ga. 180, 182, n. 2 (611 SE2d 31) (2005). As Richard's case was awaiting a hearing on his pending motion for new trial at the time of the *Crawford* decision, and because he objected to admission of the evidence on the basis of the Confrontation Clause, *Crawford* controls, and the tape of the interview should not have been played, nor the statement read.

Nonetheless, admission of evidence in violation of *Crawford* will be deemed harmless if there is no reasonable possibility that it contributed to a guilty verdict. *Yancey v. State*, 275 Ga. 550, 557-558 (3) (570 SE2d 269) (2002). The State asserts that the erroneously admitted evidence of what Richard told Brenda was merely cumulative of the contents of the properly admitted statements he made to Brown and Hampton, and therefore harmless. *Buttram v. State*, 280 Ga. 595, 597 (4) (631 SE2d 642) (2006). Richard contends, however, that the admission of the evidence was harmful, and that this case is similar to, and controlled by, *Brawner v. State*, 278 Ga. 316 (602 SE2d 612) (2004).

*Brawner* also involved a *Crawford* violation, and this Court evaluated the evidence to determine if the State had proved beyond

a reasonable doubt that the violation of Brawner's constitutional rights did not contribute to the verdict. Id. at 319 (2). In that case, the police statement given by witness Davis was admitted without Brawner having any opportunity to confront him; Davis related that he had seen Brawner shoot the victim several times while the victim pled for his life. The State argued that this was merely cumulative evidence because of the testimony of two other witnesses who saw Brawner shoot the victim, and that the admission of Davis's statement was therefore harmless. Despite the cumulative nature of the evidence, this Court found that the admission of the evidence from Davis was not harmless, noting that the credibility of the two supporting witnesses had been attacked. Id. at 319.[4]

Richard argues that, because Brown testified that he did not tell the investigating police officer that Richard said he killed a man, and because Hampton testified that his videotaped statements were fabricated, both witnesses were "impeached," and *Brawner* prohibits this Court from determining Brenda's taped interview to be "cumulative" of the evidence from those two witnesses. However, *Brawner* does not stand for the proposition that calling into question the credit of any evidence means that such evidence cannot be considered when determining whether there is a reasonable possibility that improperly admitted evidence contributed to a guilty verdict. The question remains whether, in this case, the admission of evidence prohibited by *Crawford* was harmless. *Yancey*, supra.

Nor does any attempt to impeach a witness necessarily result in all evidence from that witness being discredited as a matter of law; the jury was fully instructed on the evaluation of evidence in the face of an attempted impeachment.[5] And, any attempted attack on the credibility of Brown's testimony was unlikely to succeed; the fact that

---

[4] Of course, whether a witness is impeached is a jury question, and even if the jury determines that a witness has been impeached, credibility remains a matter for that jury. *Chapman v. State*, 263 Ga. 393, 394-395 (3) (435 SE2d 202) (1993).

[5] The trial court instructed the jury that:

a witness may be impeached by disproving the facts that have been testified to by the witness or by proof of contradictory statements previously made by the witness as to matters that are relevant to the witness's testimony and to the case.

If, after giving or if any attempt has been made in this case to impeach any witness by proof of contradictory statements previously made, you must determine from the evidence, first, whether or not the statements were made; second, whether or not they are contradictory to any statements the witness made on the witness stand; and third, whether or not it is material to the witness's testimony and to the case.

If you find that a witness has been successfully impeached by proof of previous contradictory statements, you may disregard that testimony unless it is corroborated by other credible testimony and then the credit to be given to the balance of the testimony of the witness will be for you to determine.

Brown told a police officer that he knew nothing about the motel murder was not inconsistent with his testimony that Richard said he had killed a man. At no time in his testimony did Brown link Richard's statement to Cole's murder, and he testified that Richard did not say who he killed. No evidence was presented suggesting that the investigator ever asked Brown about Richard in connection with the investigation. And, although Hampton testified that the events related in his videotaped interview were fabricated, there was considerable reason not to credit this portion of his in-court testimony: his testimony that the interview was fabricated was directly contradicted by the detective involved; on the witness stand, Hampton referred to Cooper as "another fella that was involved," lending credit to the truth of the statements he made during his interview; and he testified that he was incarcerated with Richard at the time of trial. Further, additional evidence from other witnesses also demonstrated Richard's guilt and corroborated the evidence that was the subject of the attempted impeachment: Richard's attempt to sell Shepard the Infiniti automobile taken from Cole; his control over the car shown to Johnson; his evasion of Johnson's questioning; his change of appearance and his behavior at the time of his arrest; his contradictory statements to the police, culminating in his admission to having the key to the car; and his statement that "I know I'm going to have to do some time, but I'll get out."

Unlike Brawner, in this case, there was considerable evidence against Richard that did not come from an "impeached" source. Viewed as a whole, the evidence was such that there is no reasonable possibility that the admission of the statement and interview of Brenda contributed to the guilty verdicts.[6] *Yancey,* supra.

Richard also urges that under the court's instructions, the jury could have taken Brenda's audiotape as corroboration of the "impeached" testimony of Brown and Hampton's videotaped interview. See *Brawner,* supra at 319-320. First, as noted above, it is not appropriate to view Brown's testimony as fully and successfully impeached. Second, it is not correct to state that the only corroboration of Hampton's interview was by Brenda's statements. The details of the murder, including that Cole was choked, corroborated what Hampton reported that Richard had told him, as did the evidence that Richard possessed the green Infiniti. See *Floyd v. State,* 272 Ga. 65, 66 (1) (525 SE2d 683) (2000).

---

[6] Richard contends that the fact that, during jury deliberations, the audiotape of Brenda Brown's interview was played at the jury's request shows that admission of the audiotape was harmful. However, the reason the jury requested that the tape be re-played is not in the record, nor does the re-playing of the tape alter the status of the evidence as a whole.

2. Finally, Richard contends that, without considering the statement and audiotape of Brenda, the evidence is insufficient to support the verdicts. See *Livingston v. State*, 268 Ga. 205, 212 (5) (486 SE2d 845) (1997). Even excluding the audiotape and the statement, the evidence was sufficient to enable a rational trier of fact to find Richard guilty beyond a reasonable doubt of the crimes of which he was convicted. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

*Judgments affirmed. All the Justices concur, except Sears, C. J., and Carley and Melton, JJ., who dissent.*

SEARS, Chief Justice, dissenting.

Because the improper admission of evidence in this case violated Richard's constitutional right of confrontation, the error cannot be deemed harmless unless "there is [no] *reasonable possibility* that the improperly admitted evidence contributed to the [verdict]."[7] The majority fails to show how the error in this case can satisfy that exacting standard. Accordingly, I dissent.

From a review of the overall evidence, it is plain that Brenda Brown's statements to the police were quite possibly the strongest evidence of Richard's guilt. The jury itself made that very point when, during its deliberations, it specifically requested the opportunity to hear only one piece of evidence a second time before reaching its verdict — Brenda Brown's inadmissible police interview.

The other evidence was simply not as clear and convincing as the statements of Brenda Brown. The testimony of Bobby Brown was vague and contradictory. The testimony of Charles Johnson shed little, if any, light on the killing. The evidence of Richard's haircut, as well as his statement while being arrested, failed to clearly connect him to the murder, as opposed to the other criminal activity involving the automobile. The statement given to police by Hampton, the jailhouse informant, was tainted by his testimony that he had fabricated the statement in exchange for an improper benefit, among other inconsistencies. The State introduced no forensic evidence linking Richard to the murder. Although the majority is correct that the admissible evidence was sufficient to sustain the convictions under the deferential standard demanded by *Jackson v. Virginia*,[8] it was far from overwhelming. Brenda Brown's recorded interview and

---

[7] *Yancey v. State*, 275 Ga. 550, 558 (570 SE2d 269) (2002) (emphasis supplied); see also *Brawner v. State*, 278 Ga. 316, 319 (602 SE2d 612) (2004) ("[w]hether a constitutional violation constitutes harmless error depends on whether the State can prove beyond a reasonable doubt that the error did not contribute to the verdict.") (punctuation omitted).

[8] 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

written statement to the police, however, were clear, convincing, and afflicted by none of the vagueness or inconsistencies that weakened the other evidence.

The relative importance of Brenda Brown's interview with the police was emphatically illustrated by the jury's request, during its deliberations, to be allowed to listen to it again. In *Orr v. State*, this Court faced a similar situation and found that the fact that the jury specifically requested to hear the improperly admitted evidence during its deliberations was an important factor in our determination that the error was harmful.[9] Although, as the majority notes by footnote, the record does not reflect precisely why the jury wanted to hear the interview again, the obvious conclusion is that the jury deemed it to be significant and important evidence. The jury was, after all, deliberating on Richard's guilt when it made its request, and it returned its verdict to convict shortly after hearing Brenda's statement again.

In *Brawner v. State*, this Court faced a similar violation of the defendant's right of confrontation and concluded that the error could not be deemed harmless because the State had failed to " 'prove beyond a reasonable doubt that the error did not contribute to the verdict.' "[10] Just as in this case, the erroneously admitted evidence in *Brawner* "went to the core issue of the case," and the veracity of the other primary witnesses' testimony was suspect.[11] The majority attempts to distinguish *Brawner* from the present case by pointing to the "considerable evidence against Richard that did not come from an 'impeached' source."[12] Regardless of whether the other witnesses had been officially "impeached," however, Brenda Brown's statement, like the inadmissible statement in *Brawner*, was at least as persuasive as the admissible statements and testimony of the other witnesses.[13]

To sustain the convictions, the majority strains to conclude that "[v]iewed as a whole, the evidence was such that there is no reasonable possibility that the admission of the statement and interview of

---

[9] *Orr v. State*, 281 Ga. 112 (636 SE2d 505) (2006) ("[m]ost importantly to the harmful error analysis . . . is a note from the jury . . . requesting to hear the [improperly admitted evidence] again."). It is also noteworthy that the State is required to meet a much higher burden in the present case to establish harmless error because the error violated Richard's constitutional rights, unlike the situation in *Orr*.

[10] 278 Ga. at 319 (quoting *Rowe v. State*, 276 Ga. 800, 804 (582 SE2d 119) (2003)).

[11] Id.

[12] Majority opinion at 406.

[13] *Brawner*, 278 Ga. at 319 ("[i]n contrast with the [admissible] testimony . . . the declarant's [inadmissible] hearsay statement [was] placed before the jury unimpeached because the declarant did not testify.").

Brenda contributed to the guilty verdicts."[14] Although the facts in this case are appalling, this Court must protect against the dilution of constitutional protections through the unwarranted expansion of the harmless error doctrine. If this Court can find that there is no *reasonable possibility* that the improperly admitted evidence contributed to the verdict in this case, in spite of the jury's specific request to hear only that evidence again during deliberations, and the relative weakness of the admissible evidence, then the constitutional right of confrontation is a right without a remedy.

The violation of Richard's constitutional right of confrontation was harmful error in this case, as we cannot in good conscience say that there is no reasonable possibility that it contributed to the jury's verdict. I therefore conclude that the convictions must be reversed and the case remanded for a new trial.

I am authorized to state that Justice Carley and Justice Melton join in this dissent.

DECIDED NOVEMBER 6, 2006 —
RECONSIDERATION DENIED DECEMBER 15, 2006.

*Mitchell D. Durham*, for appellant.

*Patrick H. Head, District Attorney, Dana J. Norman, Assistant District Attorney, Thurbert E. Baker, Attorney General, Edwina M. Watkins, Assistant Attorney General*, for appellee.

---

[14] Majority opinion at 406.