**FIRST DIVISION**
**BARNES, P. J.,**
**GOBEIL and MARKLE, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

*DEADLINES ARE NO LONGER TOLLED IN THIS COURT. ALL FILINGS MUST BE SUBMITTED WITHIN THE TIMES SET BY OUR COURT RULES.*

**June 25, 2021**

# In the Court of Appeals of Georgia

A21A0521. CROYLE v. THE STATE.

BARNES, Presiding Judge.

Roland Evan Croyle repeatedly rammed a sport utility vehicle (SUV) into the front door of the Twin Peaks restaurant where he and his ex-wife had once worked. After exiting the SUV, Croyle tossed accelerants throughout the restaurant, then set the building on fire. When Croyle was later asked why he had done those acts, he answered that he associated the place with the breakdown of his marriage. At Croyle's ensuing criminal trial that spanned 5 days, the jury rejected his defense that he was not guilty by reason of insanity, and found him guilty but mentally ill on each count of the indictment.[1] After merger, Croyle was convicted of 21 counts of

---

[1] See OCGA § 17-7-131 (b) (1) (" In all cases in which the defense of insanity, mental illness, or intellectual disability is interposed, the jury, or the court if tried by it, shall find whether the defendant is: (A) Guilty; (B) Not guilty; (C) Not guilty by

aggravated assault[2] and one count each of first degree criminal damage to property[3] and first degree arson.[4] Denied a new trial, Croyle contends in this appeal that the trial court erred by allowing certain expert testimony and by rejecting his claim of ineffective assistance of trial counsel. Regarding the latter, Croyle claims that his defense was prejudiced by a stipulation entered with respect to the aggravated assault counts, and by the absence of certain language from the final jury charge. We affirm.

---

reason of insanity at the time of the crime; (D) Guilty but mentally ill at the time of the crime, but the finding of guilty but mentally ill shall be made only in felony cases; (E) Guilty but with intellectual disability, but the finding of intellectual disability shall be made only in felony cases.").

[2] As for each aggravated assault count, the indictment alleged that Croyle "did make an assault upon the person of [an occupant of the restaurant] with a motor vehicle, which when used offensively against another person is likely to result in serious bodily injury, by ramming a Mitsubishi Montero into a building occupied by the victim[.]" See OCGA §§ 16-5-20, 16-5-21.

[3] As for this count, the indictment alleged that Croyle "did knowingly and without authority interfere with the property of TP Augusta, LLC, to wit: the restaurant Twin Peaks, in a manner so as to endanger human life by ramming a Mitsubishi Montero into the occupied building[.] See OCGA § 16-7-22.

[4] As for this count, the indictment alleged that Croyle "did knowingly damage by means of fire and explosives a building, the property of TP Augusta, LLC known as Twin Peaks, . . . under circumstances that it was reasonably foreseeable that human life might be endangered[.]" See OCGA § 16-6-60.

2

At the outset of the State's case in chief, the prosecutor presented video recordings of the incident that had been captured by several surveillance cameras positioned in and around the premises, as well as the testimony of several law enforcement officers who had responded to the scene, and recordings of statements that Croyle made to law enforcement officers after his arrest. Collectively, this evidence showed that at about 12:45 p.m. on June 26, 2017, a Mitsubishi Montero Sport slammed twice into the front door of the Twin Peaks restaurant. The driver of the SUV, later confirmed as Croyle, was attempting to drive the SUV *into* the restaurant. The occupants of the restaurant rushed out of the building. After additional, but still unsuccessful attempts to ram the SUV through the front door, Croyle got out of the SUV. He then made multiple trips into the building, transporting from the SUV then tossing about the dining and kitchen areas of the restaurant what was later confirmed to be aerosol cans, two propane tanks, an open cooler filled with fuel, and multiple open 5-gallon buckets of fuel. Croyle ignited a fire both in the kitchen and in the dining area, then briskly returned to the SUV.

Meanwhile, a plainclothes law enforcement officer who happened to have been driving about a block away heard the dispatcher's alert of an "accident into the building" of Twin Peaks and that "someone is trying to set the building on fire." That

3

officer, who had spent the majority of his 30-year career working in the special operations divisions (dealing with tactical solutions, the bomb squad, the SWAT team, etc.), immediately drove to the scene. As he was arriving, he observed numerous individuals running away from the restaurant. The officer parked his unmarked vehicle in a space most distant from the restaurant. Assessing the situation while walking in a nonchalant manner to the building, the officer noted an SUV with a crashed front end positioned at the front entrance of the restaurant; he then saw a lone man exit that entrance. Because the man seemed to be walking about freely, the officer approached him and asked, "What are you doing?" The man, who the officer identified at trial as Croyle, answered, "I'm blowing the building up." The officer sought to engage Croyle, "Why are you doing that?" Croyle responded that the restaurant had caused his divorce. When Croyle turned his back, the officer spotted a long, "half-sword" knife tucked through Croyle's belt loop. The officer attempted to keep their line of communication open without Croyle realizing that he had been approached by police. While they were conversing, an apparent civilian who had taken cover behind one of the vehicles in the parking lot was aiming a firearm at Croyle and shouting commands for Croyle to stop and to freeze; Croyle was intermittently yelling back to the man, "Shoot me. Shoot me." Croyle took off his

4

shirt, revealing "DNR" starkly written across his chest and stomach. Interpreting the lettering as a "Do Not Resuscitate" message, the officer discerned the situation as potentially perilous for both of them. Upon realizing that Croyle was partly distracted by the gunman crouched behind the car, and noticing that Croyle's attention had also become partly diverted to an approaching uniformed deputy sheriff who had his firearm drawn, and further determining that Croyle was *not* perceiving him (the plainclothes officer) to be a threat, the officer seized an opportunity to tackle Croyle to the ground, landing both of them in a large pool of fuel that had collected during Croyle's transport of the various containers.

The uniformed deputy sheriff handcuffed Croyle. Smoke was billowing out the front door, and the officers dragged Croyle to a safe location. The building quickly became engulfed with flames, and explosions were being heard. Concerned that arriving fire crews would attempt to enter the building, the plainclothes officer demanded from Croyle: "What did you put in the building? . . . What about all the people [in there]?" Croyle answered that he had put some aerosol cans in the restaurant; and regarding the people, Croyle insisted, "[T]hey got out." Croyle was placed in the back seat of the uniformed deputy sheriff's patrol car and transported first to a hospital (because of the fuel on his skin), and then to jail.

5

The plainclothes officer who had approached Croyle at the scene was asked at trial whether he had been able to hold an intelligent conversation with Croyle on that day; the officer answered,

> Absolutely. He knew exactly what he was saying and what his mission was. . . . He had a well-organized plan. This was not something that he did at a whim, when he was driving by. . . [I]t was a well-thought-out plan from beginning to end. I think he made mistakes along the way, but . . . it was a plan. It was not a spur-of-the-moment onset. And with us having the conversation, it was just like talking to someone else. I mean, he responded to my questions; why are you doing this? Well, it caused my divorce.

The uniformed deputy sheriff who had handcuffed Croyle testified about several statements that Croyle made to him. For instance, the deputy sheriff testified, "He said that he was supposed to die and he was supposed to take two in the chest and one in the head." The deputy sheriff testified that he understood Croyle as expressing that he had wanted to die by means of police shooting.

A responding sheriff's office investigator testified that when he arrived at the scene, Croyle was still there, but he was unable to speak to Croyle because Croyle had contaminants on him and thus had to be taken to a hospital. The investigator testified that fire crews and other fire department personnel were also there; he began

6

to examine the scene for evidence, which investigation he continued the next day. Numerous photographs taken of the aftermath were shown to the jury.

Two days after the incident, the same investigator, along with an ATF special agent, interviewed Croyle at a police station. Croyle stated that he was 45 years old, recently divorced, and living with his parents. He also said that he had two children whom he could not see because of his ex-wife's mother. Croyle told that he and his ex-wife had once worked at the Twin Peaks, but that he was fired after being wrongly accused of drinking on the job. Croyle expressed being depressed about his life. He stated that he had been prescribed medications for his depression; that he had been participating in group counseling; that he sometimes could not remember things (that other individuals would tell him he had done); and that he found it "hard to think some days." When asked what was going on at about 12:35 on the afternoon in question, however, Croyle readily answered that he had intended to catch on fire, sit in a booth, stab himself in the chest with the knife he had secured "in [his] back," then die. Croyle further revealed that he had planned for the burning building to serve as his funeral pyre. When asked why he had gone to Twin Peaks to kill himself, he explained that the restaurant had been the place where he had lost his respect, where his wife had lost respect for him, where he had realized that he had failed her, where

"it hurt me the most," and where he thus needed to die. Croyle recounted that in saying his goodbyes, he had visited his children and given them his wisdom teeth because he had nothing else to give. Croyle further recounted that he had purchased gasoline from a gas station; that he had tried to drive the SUV *into* the restaurant so that he "could get the gasoline and stuff out easier"; that he had thrown propane tanks and gas cans into the building to fuel the fire; that he had "wanted the pain of being worthless to stop"; and that when he went back outside the restaurant to retrieve the last container of gas from the SUV, he was confronted by two men. A recording of Croyle's police interview was played for the jury.

Next, the State began presenting the accounts of various individuals who had been inside the restaurant when Croyle slammed the SUV into the front door. One such occupant (and an alleged aggravated assault victim), testified that he was eating lunch with his son-in-law when he heard a "real loud" crash "like metal and glass breaking." He immediately stood up and looked in the direction of the sound, and saw an SUV protruding through the restaurant's front door. He recalled, "[A]t first, . . . I wasn't sure if it was an accident, but when he backed up and hit it again, that's when everybody – the waitress escorted everybody out the back." This trial witness described that he and other occupants walked around the side of the building and

8

back to the front to see what was going on. From his vantage point, he testified, he observed a man grabbing from an SUV "five-gallon buckets of gas and a cooler – well I can't say gas – liquid and a cooler with liquid in it and then . . . I seen those propane tanks come out, I told [the individuals who were hiding behind my vehicle] to move. We've got to leave." The trial witness testified that he and his son-in-law rushed into his vehicle, then drove away because "I wasn't sure how bad . . . [the] explosion was going to be, so I didn't want to be in that area." (Defense counsel asked no questions of that trial witness.)

The State proceeded by calling to the stand one of the restaurant's cooks who had been working in the kitchen when he heard a loud boom.[5] Initially, the cook thought perhaps a keg had fallen over, but when numerous individuals ran through the kitchen and out the back door, he joined them. From across the street, he observed Croyle – with whom the cook had once worked at that restaurant – trying, about three of four times, to "get the [SUV] into the front of the building." The cook testified, "I guess he realized he couldn't get it in. Got out of the vehicle and started going in and out of the building bringing things into the building. Kind of like propane tanks and some kind of liquid." (Defense counsel did not ask this trial witness any questions.)

---

[5] This individual was not alleged to have been a victim of aggravated assault.

9

The State moved on to another restaurant patron (and a second alleged aggravated assault victim). He recounted that he, his wife, and their daughter had just paid for their lunch when they heard a crash toward the front of the restaurant. He testified, "[T]hen we heard one of the waitresses say, here he comes again, and we all turned around and started heading toward the rear of the building. And then we heard another crash." He described the exodus at trial as "[j]ust a bunch of people trying to get out of the building" – rushing to the back door, then funneling out into the back parking lot. Although this restaurant patron had tried to reach his vehicle, a law enforcement officer had arrived on the scene and was blocking his path. After walking to the parking lot next door, the patron saw a man grabbing items from an SUV and taking them inside the restaurant. Shortly thereafter, as the patron described at trial, he saw "lots of fire" and could feel the heat. The patron recalled feeling "shook up." (Defense counsel asked no questions of this trial witness.)

The State then called to the stand the wife of the previous trial witness (and a third alleged aggravated assault victim). She likewise recounted that about the time they were paying for their lunch, they heard a commotion at the front of the restaurant, and then heard the check-in hostess exclaim that "he's going to ram again." At that point, she (the trial witness) and her family members rushed out the

10

back door. And from her vantage point outside, she observed a person transporting buckets of "sloshing" liquid into the front entrance of the restaurant. Shortly thereafter, she saw fire coming from the restaurant. Toward the end of her direct testimony, she was asked how she had felt during the episode. She replied that after the first "sound of the thing," she was concerned that someone had been hurt; but that after the "second time," she felt "panicky" and "real, sort of, terrified." (Defense counsel asked no questions of this trial witness.)

The State proceeded by calling to the stand one of the restaurant's server (and a fourth alleged aggravated assault victim). She recounted that she was in the kitchen when she heard a crash. She began walking toward the area of that sound, but was turned around by a manager who instructed her to evacuate the restaurant because someone had driven a vehicle into the building. Terrified for her safety, the server exited the back of the building and ran to a nearby business. From there, she observed in the Twin Peaks parking lot a man carrying buckets from an SUV into the building. Shortly thereafter, she observed the building on fire. (Defense counsel asked no questions of this witness.)

At this point in the trial, the court called a lunch recess. Outside the presence of the jury, the judge asked the lawyers to consider whether any stipulation(s) would

11

be appropriate to pare down the case. When the judge, the lawyers, and Croyle returned to the courtroom after lunch, the judge revisited the possibility of any stipulation(s), commenting on the seemingly repetitious testimony being presented by the State and the lack of any cross-examination thereon by the defense. After an additional recess, the lawyers reported to the judge that they had agreed to stipulate to certain matters, and the following occurred:

> [THE PROSECUTOR]: . . . [T]his is a stipulation for trial strategy reasons on both sides, from the State's perspective to avoid calling out-of-town witnesses and to avoid the continual presentation of witnesses that will say the same thing, . . . and I'd just like [defense counsel] to acknowledge that this was . . . something based on her trial strategy.
> THE COURT: Do you agree?
> [DEFENSE COUNSEL]: Yes.
> . . .
> THE COURT: . . . And so you've had a chance to talk about this with your client?
> [DEFENSE COUNSEL]: Yes.
> . . .
> [THE PROSECUTOR]: And Your Honor, this would make my going forward today, I can send several witnesses, essentially, home, and to pare it down substantially to, I believe, just addressing four witnesses and among them brief points that are not covered by the stipulation.

12

When the jurors were summoned back into the courtroom, the trial court announced to them that the State and the defense had reached a number of stipulations, including one that would establish that the individuals named in the indictment "were present at the restaurant when allegedly all of these things happened." Relevant in this appeal is the stipulation that pertained to the aggravated assault counts. As the trial court apprised the jurors, the State and defense had agreed to stipulate:

> [O]n June 26th, 2017, the Defendant did make an assault upon – and by the time we get through, I will tell you, I will list every victim in Counts 3 through 23 of the indictment. But assume that I have inserted every single name in there. They are agreeing to all of the – those names, by driving a Mitsubishi – a Mitsubishi Montero into Twin Peaks while occupied by each of those victims. As to all of these offenses, but specifically as to this; Defense Counsel is reserving the defenses – defenses of insanity, mental illness and intellectual disability, which must be ultimately decided by you.

Continuing with the State's case-in-chief, the prosecutor called witnesses to testify primarily about events that had *preceded* the incident. For instance, the State called to the stand the individual who had worked at the restaurant as a busser bar back. He had trained Croyle on his job, which was also to work as a busser bar back.

13

After eliciting that introductory background, the prosecutor swiftly honed the direct examination "really to the one issue present; sir, when you were working with Mr. Croyle, did he ever make a statement to you that he should blow the place up or anything like that?" The witness answered, "Yes, he did. He did."

Another witness called by the State had worked in a supervisory capacity at Twin Peaks, and had played a role in firing Croyle. He recounted that after receiving a report that Croyle was drinking beer behind the bar while on duty, he (the supervisor) and another manger summoned Croyle into an office. Croyle admitted that the beverage he had consumed behind the bar was beer, but claimed that he had brought the beverage into the restaurant. Croyle was fired on the spot, as bringing outside food or beverage into the building was a rule violation. Croyle began walking away, but then ran back to the supervisor – screaming that the supervisor would pay for firing him. This trial witness testified that he had been at the restaurant on the day Croyle started the fire.

The State called Croyle's former wife who was the mother of his children. She testified that during their 16-year marriage, Croyle's mental state appeared to become increasingly unstable. She decided to leave him because he had become very abusive. In August 2016, she moved out of their residence and filed for a divorce. She had

helped Croyle get his job at Twin Peaks, and in September 2016, Coyle was fired. Yet, he continued to show up at the restaurant to see her when she was working. He also was texting her "[a]ll day long," so she changed her number. In November 2016, she stopped working at Twin Peaks. Their divorce became final the following month. And thereafter, Croyle began receiving counseling. Croyle's ex-wife further identified the date of the incident, June 26, 2017, as her birthday.

The State called to the stand the mother of Croyle's ex-wife. She recounted that on the morning of June 26, 2017, Croyle came to her home where his two children were living. She testified that Croyle went into his 15-year-old daughter's room and that she heard him say to her, "I want to give you something of mine." The witness testified that Croyle then went into his 11-year-old son's room. The boy was frightened, and ran out the back door and into a nearby wooded area. Croyle's former mother-in-law reminded Croyle that he was not allowed to be there and told him to leave; Croyle lunged toward her with a knife; she leaned back, and the knife struck the wall. Croyle's former mother-in-law told Croyle's daughter to call the police; as the daughter was speaking with dispatch, Croyle looked back at his daughter, then ran to his vehicle and sped away. When a law enforcement officer responded to her residence, Croyle's former mother-in-law reported to the officer, among other things,

15

that she had overheard Croyle saying to his children that he was going to commit suicide that day; that he had given one of his wisdom teeth to each of his children; and that while at her home, he had threatened to cut off his ring finger.

The State also included in its case-in-chief testimony of a lieutenant at the fire department who had been assigned to investigate the fire. He had discovered a surveillance video at a gas station a few miles from Twin Peaks, which recording showed Croyle purchasing fuel at about 12:22 p.m. on June 26, 2017 (about 20 minutes before Croyle arrived at the restaurant). This recording was played for the jury.

Croyle elected not to take the stand, but called several witnesses. A counselor at a short term inpatient facility, who had seen Croyle in individual and group therapy sessions between February and May 2017, testified that Croyle had expressed feeling useless because he had not yet gotten another job; that he refused to take personal responsibility for his situation; that he blamed others for his unemployment; that he had suggested that his medications were not working properly; and that because Croyle was having some suicidal ideations, she had recommended that Croyle be

16

admitted into the facility's crisis stabilization unit.[6] Further, the counselor testified that Croyle was able to hold an intelligent conversation; that he used deflection to avoid answering questions; and that he had never mentioned that he was hallucinating or experiencing blackouts or any "disassociation."

A peer specialist at the same facility, who had met with Croyle in individual and group settings in May 2017, testified that Croyle was very depressed; that he was having no contact with his children because of his ex-wife and her mother; that he had no income; that the medications that he had been taking for two months had not helped him; and that he had expressed wanting his emotional, mental, and physical pain to stop. The peer specialist recalled that Croyle had mentioned facing two upcoming tough days (one of which was his ex-wife's birthday); and that if he could get through those two days, he would be okay. The peer specialist testified that she had last seen Croyle at a group session on the day of the incident, and that Croyle mentioned to her that it was his ex-wife's birthday. At that session, Croyle rated his feelings, using a scale of one to ten, at zero. And when that session ended, Croyle indicated to the peer specialist that he would not be returning.

---

[6] The trial transcript shows that Croyle spent about 10 days in the crisis stabilization unit, which period ended on February 14, 2017.

Croyle's treating psychiatrist was qualified at trial to testify as an expert. The psychiatrist had met with Croyle on May 11, 2017 and May 25, 2017. Croyle complained of experiencing depression, crying spells, physical pain, nightmares, high levels of stress, being upset because of unemployment, and the failure of his prescribed medicines – an anti-depressant drug and a pain medication – to provide any relief. The psychiatrist testified, "The diagnosis that we had for [Croyle] was the bipolar disorder type II, generalized anxiety disorder and that some of the emotional diagnosis indicative of some of his emotional problems could have contributed to the increased severity of the pain." The psychiatrist had ascertained that Croyle was having chronic suicidal thoughts. The psychiatrist increased the dosage on the pain medication, and added lithium for mood stability.

On cross-examination, the psychiatrist testified that during their two sessions, Croyle was capable of intelligently answering his questions, and that Croyle never described experiencing hallucinations, "disassociating," blacking out, or otherwise losing time segments.

Croyle also called his parents to the stand. His mother recounted that at about 9:00 a.m. on the date of the incident, Croyle came to her home; that he was crying and seemed overwhelmed; and that during that time, he was still grieving because of his

divorce. He left her home to attend a scheduled group therapy session, but returned at about 11:00 a.m., telling her that there were no answers for him. Croyle left his mother's house again, but came back at about noon; during that brief visit, he handed her his house keys and wallet, and told her that she could have the small amount of money left on his debit card; he said that he could not stand the pain anymore and was finished. As he was walking toward a Mitsubishi SUV, Croyle was crying and saying that he was of no use even to his own children.

Croyle's father (who was not at home when Croyle made his visits on June 26, 2017) testified that Croyle was in "extreme distress and despair" because he had put about 15 years into a marriage and had believed everything was okay. Further, Croyle's father revealed that he himself had suffered from mental health conditions, which he identified as "borderline paranoid schizophrenic and manic depressant." Croyle's father also testified that he had tried committing suicide when he was 18 or 19 years old, and had undergone treatment for about a year. Croyle's father testified that his own father was schizophrenic, did not receive any treatment, and had committed suicide.

In rebuttal, the State called as an expert a licensed psychologist who had been conducting forensic mental health evaluations since 2001. About a year after the

incident, the psychologist began evaluating Croyle, which included interviewing Croyle in person on three occasions; reviewing Croyle's heath (including mental) records; and examining the discovery materials in the instant case such as the recordings captured by Twin Peaks' surveillance cameras and the recording of Croyle's police statement. The psychologist also performed psychological testing to screen whether Croyle was feigning psychopatholgy (i.e., "faking mental-health symptoms").

When asked whether he had made any diagnostic conclusion regarding Croyle, the psychologist answered, "I thought at the time of the offenses, he had a major depression disorder and I also believed he was suffering and experiencing an alcohol-use disorder." The psychologist testified, "Croyle, himself, informed me that he was routinely drinking up to a 12-pack of beer, as well as some vodka, fairly regularly." The psychologist further testified that depression disorders could be triggered by the loss of a significant relationship, and cited that Croyle had recently gone through a divorce and had lost regular contact with his children.

The psychologist opined that the screening test employed had shown, however, that Croyle "was actively engaging in faking psycholopathology" during their interviews. As the psychologist went on to testify,

20

During my interviews with Mr. Croyle, specifically regarding the events and his mental health at the time of the offense, he came up with a variety of factors that he said he was experiencing that were not anything that you would see from anyone who's having regular and real mental-health symptoms. . . . [F]or example, he basically indicated that at some point he had no real memory of doing anything or causing any offense. He said . . . everything was kind of this vague, sort of state, where he was like in a dreamlike state, where he's just kind of going through the motions. He's talking about all these command hallucinations he was having. Things that he was being told to do things like to go to the restaurant. When you put it altogether and you looked at the symptoms that he endorsed, they just did not make sense. . . . At some point he said he basically arrived at the restaurant and he didn't even realize he was there until he was on the ground being held for the police. And again, that's very atypical to go through and more importantly it wasn't consistent with other statements he'd made to me throughout the three days of interviewing that I did with him.

As the psychologist elaborated,

[O]ne of the statements that he made that I thought was really interesting was that despite the fact that he had no recollection of the actual events leading up to the fire and everything else, he was able to specifically tell me every alleged symptom that he was having at that exact time. Those two things, quite frankly, just did not go very well together. If someone was having the sort of vague states as he was explaining, . . . why could you just remember the symptoms but never remember your actual actions. Those two things just do not go together.

21

Moreover, the psychologist testified, Croyle's background records had included no reference that Croyle had been experiencing a loss of time, and it was only when he (the psychologist) asked Croyle about his mental health at the time of the incident did "this vagueness . . . come up." The psychologist testified that he had discerned several indicators during his interviews with Croyle that Croyle had more knowledge of what had occurred than what he was trying to suggest during his interviews. By way of example, the psychologist cited that Croyle had explained to him that he faulted Twin Peaks for his marital break up; that he was upset about what he perceived the restaurant had done to him; and that he had selected his wife's birthday to do what he did at the restaurant. The psychologist testified that he had discerned during his personal interviews with Croyle that, on the day in question, Croyle had *not* been some disorganized person experiencing the symptoms that he was reporting during the interviews; instead, Croyle's actions at the restaurant demonstrated a person who had already made plans and was simply executing them. By way of example, the psychologist cited the amount of materials that Croyle had brought with him to set the building on fire; and the manner in which he moved about the restaurant while starting the fire – not in some haphazard or aggressive manner, but in a careful way so as not to harm himself. Referring to the restaurant's surveillance

recordings, the psychologist pointed out, "[Croyle] tried several times before it actually went on fire and as soon as it – he saw that it was on fire, he immediately exited the building."

Toward the end of direct examination, the psychologist testified,

I think it was clear that Mr. Croyle was very angry about the divorce, about the loss of the children, about the loss of his job. . . . I'm not trying to minimize the fact that Mr. Croyle was depressed. I believe he was depressed. . . . But that wasn't really the question. The question is . . . did his symptoms interfere with his ability to know right from wrong.

When asked as a follow-up question whether it was "his expert opinion . . . that on the day, during the time in question, that [Croyle] appreciated that his actions would have consequences," the psychologist replied, "Yes, my impression that on June 26, 2017, he had the ability to differentiate – know right from wrong, at the time of the offense. That is my opinion."

1. Croyle contends that the trial court erred by allowing the psychologist to testify that he knew the difference between right and wrong at the time the crimes were being committed. Croyle argues that such testimony violated OCGA § 24-7-704

23

(b),[7] because it opined on the ultimate issue. Croyle points out that the testimony was harmful, given the stipulation, and given his defense of insanity.

> In Georgia, a defendant is presumed to be sane. To overcome this presumption, a defendant wishing to assert an insanity defense has the burden to prove by a preponderance of the evidence that he was insane at the time the crime was committed. This affirmative defense of insanity may be established by showing that, at the time of the act constituting the crime, the defendant . . . did not have mental capacity to distinguish between right and wrong in relation to such act[.]

(Citations and punctuation omitted.) *Jackson v. State*, 301 Ga. 878, 881 (3) (804 SE2d 357) (2017).[8]

The trial transcript shows that when the expert psychologist gave the opinion now flagged by Croyle, defense counsel neither objected thereto, nor asked for any

---

[7] OCGA § 24-7-704 (b) ("No expert witness testifying with respect to the mental state or condition of an accused in a criminal proceeding shall state an opinion or inference as to whether the accused did or did not have the mental state or condition constituting an element of the crime charged or of a defense thereto. Such ultimate issues are matters for the trier of fact alone.").

[8] The affirmative defense of insanity may also be established by showing that, at the time of the act constituting the crime, the defendant had a mental disease causing "a delusional compulsion as to such act which overmastered his will to resist committing the crime." (Citations and punctuation omitted.) *Jackson*, 301 Ga. at 881 (3). But this alternative basis is not argued in this claim of error.

remedial relief. Notwithstanding, Croyle claims on appeal that "[b]ecause this is a preserved evidentiary issue, the test 'is whether it is highly probable that the error did not contribute to the verdict.' *Kirby v. State*, 304 Ga. 472, 478 [(3) (c) (819 SE2d 468) (2018) (discussing harmless error under OCGA § 24-1-103 (a))]." Croyle's claim of a "preserved evidentiary issue" is premised on the trial court's pretrial ruling upon a motion in limine as to the admissibility of expert testimony, "I find in favor of the defense and I'm going to order that no witness, may be laid, expert or otherwise, may give their opinion as to the ultimate issue as to whether or not the Defendant meets the legal definition of insane or mentally ill or intellectually disabled."[9]

But where, as here, the case was tried with Georgia's current Evidence Code in effect,[10]

> if . . . a party violates [a] ruling [made upon a motion in limine], the
> party that moved to exclude the evidence must make a contemporaneous

---

[9] On appeal, however, Croyle does *not* contest the trial court's definitive ruling as to the admissibility of the expert's opinion; in fact, he acknowledges in his appellate brief that "the [trial] court correctly determined pretrial that the testimony was not allowed under [OCGA § 24-7-704 (b)]."

[10] Georgia's current Evidence Code took effect on January 1, 2013. See Ga. L. 2011, p. 99 § 1.

objection to its admission when the evidence is offered in order to preserve the claim of error for appeal because the error, if any, in such a situation occurs only when the evidence is offered and admitted.

(Punctuation omitted.) *Kennison v. Mayfield*, 359 Ga. App. 52, 60 (1) (a) (856 SE2d 738) (2021), citing *ML Healthcare Svcs. v. Publix Super Markets*, 881 F3d 1293, 1305 (II) (E) (11th Cir. 2018) (quoting the advisory committee notes to Fed. R. Evid. 103, which is nearly identical to OCGA § 24-1-103).[11] And recently, the Supreme Court of Georgia expressly resolved any residual tension perceived from cases such as *Reno v. Reno*, 249 Ga. 855, 856 (1) (295 SE2d 94) (1982):

[B]ecause OCGA § 24-1-103 (a) (2) is specifically patterned after Federal Rule of Evidence 103 (b), and the Eleventh Circuit interprets that provision, based on the Advisory Committee Notes, as requiring a contemporaneous objection when a ruled-upon motion in limine regarding the admissibility of evidence is allegedly violated at trial, it is clear that the adoption of OCGA § 24-1-103 (a) (2) abrogated the contrary holding announced in *Reno* that no contemporaneous objection is required to preserve the alleged error when a party violates such a ruled-upon motion in limine.

---

[11] See generally *State v. Orr*, 305 Ga. 729, 740 (827 SE2d 892) (2019) ("Where rules in the new Evidence Code are materially identical to Federal Rules of Evidence, we look to federal appellate law, and in particular the decisions of the United States Supreme Court and the Eleventh Circuit, to interpret them, instead of following our own precedent issued under the old Evidence Code.").

*Williams v. Harvey*, __ Ga. __ (1 ) (a) (__ SE2d__) (2021 Ga. LEXIS 256; 2021 WL 1950896; Case No. S20G1121, decided May 17, 2021).

Consequently, because defense counsel did not make a contemporaneous objection to the psychologist's opinion complained-of now, Croyle waived review of the issue under the asserted test. See *Williams* __ Ga. at __ (1) (a); *Kennison*, 359 Ga. App. at 60 (1) (a) ("[A]bsent a contemporaneous objection that plaintiffs' counsel was violating the ruling in limine, the mere grant of [the defense] motions in limine did not preserve error for appellate review."); *ML Healthcare Svcs*., 881 F3d at 1305 (II) (E) (explaining that despite the ruling on the motion in limine, "[b]ecause [the appellant] failed to object to the two statements [at issue], we review their admission for plain error"). See generally *Shaw v. State*, 292 Ga. 871, 873 (2) (742 SE2d 707) (2013) (noting that "harmless-error" analysis is different from "plain-error analysis").[12]

---

[12] See generally *Barton-Smith v. State*, 309 Ga. 799, 804 (3), n. 6 (848 SE2d 384) (2020) (analyzing requisite showings for "nonconstitutional harmless error" and for "plain error").

Assuming arguendo that Croyle is nevertheless entitled to review for "plain error,"[13] his challenge to the testimony is unavailing for lack of "an affirmative showing that the [cited opinion] probably did affect the outcome below." (Citation and punctuation omitted.) *Gates v. State*, 298 Ga. 324, 326-327 (4) (781 SE2d 772) (2016) (explaining how to assess whether "plain error" resulted from the admission of evidence).

The uncontroverted evidence showed that Croyle crafted a plan to crash the SUV *through* Twin Peaks' front door and burn down the restaurant because he faulted it for his perceived life failures, and that he executed his plan of action to do so. After he was arrested, Croyle expressed to the deputy sheriff that he had anticipated being shot to death by police – showing that Croyle understood at the time

---

[13] See OCGA § 24-1-103 (d) ("Nothing in this Code section shall preclude a court from taking notice of plain errors affecting substantial rights although such errors were not brought to the attention of the court.").

Croyle has made no argument that "plain error" occurred in connection with the jury's hearing the expert's flagged opinion. See, however, *Russell v. State*, 309 Ga. 772, 782-783 (3) (a) (848 SE2d 404) (2020) (noting that "[the appellant] makes no mention of plain error in his argument on appeal and thus makes no attempt to show that his challenge meets all four requirements for demonstrating plain error," yet analyzing whether plain error resulted from the complained-of issue), and *Keller v. State*, 308 Ga. 492, 497 (2) (a) (842 SE2d 22) (2020) (outlining four circumstances in which plain error review is allowed and explaining that the Georgia Supreme Court will not expand such review to other circumstances absent direction from the General Assembly).

he was crashing the SUV into the restaurant during lunch time and setting the place on fire that such acts were indeed wrong and thus would likely provoke law enforcement's response. Although two days later, Croyle expressed during his jailhouse interview that he sometimes could not remember things (that other individuals would tell him he had done), Croyle went on to recall in that same police statement *how* he had purposefully driven the SUV filled with accelerants into the Twin Peaks' front door and set the building on fire, and *why* he had done those acts. Furthermore, Croyle's own mental health expert, the psychiatrist who treated him during the month before the incident, testified that Croyle never described experiencing hallucinations, "disassociating," blacking out, or otherwise losing time segments. And the psychologist who evaluated Croyle about a year after the incident detailed how he reached a conclusion that Croyle had more knowledge of the Twin Peaks incident than what he was then trying to suggest.

While Croyle had a family history of mental illness, and suffered himself from mental illness, physical pain, and suicidal ideation, "[Croyle] has not drawn any connection between [those] facts to show that he could not distinguish right or wrong at the time of the crime[s], especially in light of [Croyle's] own [statements to the plainclothes officer who closed-in on him, to the uniformed deputy sheriff who

29

handcuffed him, and to the investigator who interviewed him at the police station] that he knew exactly what he was doing, he knew the reason that he was doing it, and he believed that he was justified in doing so." *Jackson*, 301 Ga. at 882 (3). See id. at 881 (3) (explaining that the defendant being tried for murdering his sister had not adduced evidence that would support an insanity defense, where "the evidence showed that [the defendant had] knowingly intended to confront his sister because he believed that she had taken his social security check and that he set forth a plan of action to do so"); *Durrence v. State*, 287 Ga. 213, 216 (1) (a) (695 SE2d 227) (2010) ("Bipolar Disorder is a mental illness or mental abnormality but is not the equivalent of legal insanity."); *Lawrence v. State*, 265 Ga. 310, 312 (2) (454 SE2d 446) (1995) ("Legal insanity is not established by a medical diagnosis that an individual suffers from a mental illness such as a psychosis."); *Salter v. State*, 257 Ga. 88, 89 (1) (356 SE2d 196) (1987) (concluding that the defendant's psychosis and mental illness did not meet the test of insanity which would require a verdict of not guilty by reason of insanity; explaining further that even assuming the defendant's previous commitment in a psychiatric hospital raised a counter presumption to the rebuttable presumption of being sane, the defendant's administrative release from hospitalization cancelled any previously existing presumption of insanity, leaving a presumption of sanity,

30

which was rebuttable); *Nelms v. State*, 255 Ga. 473, 475 (2) (340 SE2d 1) (1986) ("[T]he fact that a person is schizophrenic or suffers from a psychosis does not mean he meets the test of insanity requiring a verdict of not guilty on the basis of insanity.").[14]

Hence, in light of the presumption of sanity, the admissible evidence that Croyle could distinguish right from wrong at the time the acts were committed, and Croyle's failure to draw any connection between his mental illness and an (asserted) inability to distinguish right from wrong, we conclude that Croyle has made no affirmative showing that the psychologist's opinion probably affected the outcome below and has thus failed to establish plain error. See generally *Gates*, 298 Ga. at 326-327 (3) (finding no plain error resulted from the admission of challenged evidence, because in light of the overwhelming evidence of the defendant's guilt, it

---

[14] See also *Phillips v. State*, 255 Ga. 539, 541 (4) (340 SE2d 919) (1986) (testimony that the defendant had a "mad," "wild," and "unnormal" look did not amount to even slight evidence that the defendant was legally insane); *Nelson v. State*, 254 Ga. 611, 613 (1) (331 SE2d 554) (1985) ("Schizophrenia is a psychosis, but a psychosis is not the equivalent of insanity – although they may be difficult to distinguish. It is a mental illness.") (citation and punctuation omitted); *Brown v. State*, 250 Ga. 66, 71 (2) (295 SE2d 727) (1982) ("Admission to a mental institution will not give rise to a presumption of insanity absent an adjudication of insanity.").

31

could not be said that any error in the admission of the challenged evidence likely affected the outcome).

2. Croyle contends that he was denied the effective assistance of trial counsel. To succeed on this contention,

> [Croyle] must show that his counsel's performance was professionally deficient and that he suffered prejudice as a result. See *Strickland v. Washington*, 466 U.S. 668, 687 (III) (104 SCt 2052, 80 LE2d 674) (1984). To establish deficient performance, [Croyle] must prove that his lawyer performed [her] duties in an objectively unreasonable way, considering all the circumstances and in the light of prevailing professional norms. Further, to establish prejudice, [Croyle] must prove that there is a reasonable probability that, but for counsel's deficiency, the result of the trial would have been different. It is not enough to show that the errors had some conceivable effect on the outcome of the proceeding. Rather, [Croyle] must establish a "reasonable probability" of a different result, which means "a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694 (III) (B). We need not address both components of this test if [Croyle] has not proved one of them.

(Citations and punctuation omitted.) *Neuman v. State*, 311 Ga. 83, 96-97 (5) (856 SE2d 289) (2021).

32

Croyle specifically complains that his trial lawyer: (a) entered the stipulation regarding the 21 counts of aggravated assault; and (b) failed to ask for certain language to be included in the final jury charge. When Croyle's trial lawyer was asked at the new trial hearing to explain the purpose of the stipulation, she replied that it was a matter of trial strategy. As the lawyer recounted, the State had already presented to the jury recordings from the restaurant's surveillance system, which showed Croyle committing the acts; the State had already presented to the jury Croyle's police statement, wherein Croyle admitted doing the acts; and the State was in the process of calling to the stand the numerous alleged victims to "testify one after the other, and essentially they were saying pretty much the same thing over and over and over again." As the lawyer explained at the new trial hearing, there was no question as to who had perpetrated the underlying acts, and Croyle's defense was that he was not guilty by reason of insanity; hence, she had determined that the stipulation would avoid frustrating and exhausting the jurors with ongoing repetitious accounts, and allow them to remain engaged and alert for consideration of Croyle's insanity defense.

When the lawyer was asked at the new trial hearing why she had not requested that the final charge include specific language from a certain appellate decision, she

expressed that it was her goal to have the jury fully instructed on the defense advanced, but that the language used in the cited decision was not a part of any pattern jury instruction.

> Counsel's decisions as to which theory of defense to pursue and which charges to request in light of the defense theory are strategic ones and therefore are the exclusive province of the lawyer after consultation with the client. As a general rule, matters of strategy, whether wise or unwise, do not amount to ineffective assistance of counsel.

(Punctuation and footnote omitted.) *Breazeale v. State*, 290 Ga. App. 632, 635 (5) (660 SE2d 376) (2008). But "invoking the words 'tactics' and 'strategy' does not automatically immunize trial counsel against a claim that a tactical decision or strategic maneuver was an unreasonable one no competent attorney would have made under the same circumstances." (Citation and punctuation omitted.) *Benham v. State*, 277 Ga. 516, 518 (591 SE2d 824) (2004).

(a) *Stipulation*. Croyle advances several arguments to support his position that entering into the stipulation was unreasonable and prejudicial.

(i) Croyle asserts that it was unreasonable to enter the stipulation as to two of the aggravated assault counts, because the prosecutor had already reported that the alleged victims therein – "John Page" and "Carlos Grace" – were not available to

34

testify. Croyle posits in his appellate brief that "testimony was required *from the alleged victims* in order for the State to prove either that (1) the victims were likely to receive a serious bodily injury from the vehicle ramming into the building, or (2) the victims were in reasonable apprehension of injury from the vehicle ramming into the building." (Emphasis supplied.) According to Croyle, without testimony from "John Page" and "Carlos Grace," the State would have been unable to prove the predicate assaults. Croyle further complains that because of the stipulation, he is now foreclosed from raising evidence insufficiency as to those two counts. For the reasons that follow, Croyle's attacks are unavailing.

Regarding the referenced prosecutor's reports as to "John Page" and "Carlos Grace," the trial transcript shows more fully that during the preliminary discussion between the court and counsel as to whether any stipulation(s) would be appropriate, the following transpired:

> THE COURT: . . . But, remember that you are stipulating – you would
> be stipulating to facts as opposed to intent, probably from [the defense]
> standpoint.
> . . .
> THE COURT: And from [the State's] standpoint, you would want to
> make sure that all the elements of the crime maybe short of intent are
> established. I'm still going to allow you to present your witnesses much

35

like you are right now. Do you have any of the listed victims who are in the indictment who are not available?

[PROSECUTOR]: That are not available – ones that we have – as far as ones that we have not heard back from. There is a John Page from Jackson, South Carolina. However, *we do have somebody who was seated with him*.

The Court: Okay.

[PROSECUTOR]: I also have . . . a Carlos Grace . . . [who is] not available.

(Emphasis supplied.)

Given the language italicized above, it appears that the State was prepared to show that John Page was seated in the restaurant when Croyle began crashing the SUV into the front door. Furthermore, the reaction by *all* the restaurant's occupants had already been evinced by the restaurant's surveillance videos, by the testimony of multiple occupants, and by Croyle's own answer – "they got out" – to the plainclothes officer who demanded to know "[w]hat about all the people [in there]." Accordingly, we find unavailing Croyle's premise that testimony was required from John Page in order for the State to prove the predicate assault. Indeed, the Supreme Court of Georgia has held that "the failure of a victim of an assault to testify at trial does *not* necessarily result in the evidence against the defendant being insufficient." (Emphasis

36

supplied.) *Bostic v. State*, 294 Ga. 845, 847 (1) (757 SE2d 59) (2014) (rejecting argument that, because the aggravated assault victims did not testify at trial, there was no evidence that the victim had been placed in reasonable apprehension of receiving a violent injury; reciting that "the state of mind of the victim of an assault . . . may be established by circumstantial evidence"; and reasoning that evidence regarding the victims' retreat constituted sufficient circumstantial evidence of their states of mind).[15]

Moreover, "*Strickland* places a heavy burden on the defendant to affirmatively prove prejudice." (Citation and punctuation omitted.) *Neuman*, 311 Ga. at 97 (5). This means that "[i]n the context of an ineffective assistance of counsel claim, it was [Croyle's] burden, not the State's, to ensure that the trial court had sufficient

---

[15] See *Eggleston v. State*, 309 Ga. 888, 891 (848 SE2d 853) (2020) ("Even without considering this direct evidence of guilt, however, the circumstantial evidence was enough to support [the appellant's] convictions," which required a showing, inter alia, that the appellant was guilty of "the commission of an aggravated assault."); *Lattimer v. State*, 231 Ga. App. 594, 595 (499 SE2d 671) (1998) (the presence of a weapon may be established by circumstantial evidence, and a conviction for aggravated assault may be sustained even though the weapon was neither seen nor accurately described by the victim; some physical manifestation is required or some evidence from which the presence of a weapon may be inferred). And see generally *Shaw v. State*, 238 Ga. App. 757, 759 (1) (519 SE2d 486) (1999) (explaining that "one can place another person in reasonable apprehension of violent injury by firing into the air as well as by firing at the victim").

information to determine the merit of [his challenge relating to the aggravated assault count alleging "John Page" as the victim]." *Pierce v. State*, 286 Ga. 194, 200 (4) (686 SE2d 656) (2009). Here, in light of the prosecutor's full report as to "John Page," together with the recordings and testimony as to the incident itself, the trial court was authorized to conclude that Croyle had failed to carry his burden of affirmatively demonstrating requisite prejudice.

Croyle's attack with respect to "Carlos Grace" suffers a similar fate. As noted above, the trial transcript shows that during the preliminary discussion concerning the appropriateness of any stipulation(s), the prosecutor reported that "Carlos Grace" was unavailable. But as the trial transcript confirms, the prosecutor later called to the stand "Carlton Grace." With the stipulation by then in place, the prosecutor briefly introduced this trial witness – as we have set out above – as the restaurant's busser bar back who had trained Croyle to work as a busser bar back, then the prosecutor swiftly honed direct examination to elicit from that witness Croyle's prior statement that he (Croyle) should blow up the place. While on the stand, and as is relevant to this contention, Grace went on to recount that "immediately after" the incident, he "hung around" the parking lot and spoke with one of the responding law enforcement

officers; and that in doing so, he reported to that officer that he had once worked with Croyle, and had come to believe that Croyle's "mind was not stable."

In the context of this ineffective assistance of counsel claim, Croyle had the burden to ensure that the trial court had sufficient information to determine the merit of his challenge relating to the aggravated assault count alleging "Carlos Grace" as the victim. See *Pierce*, 286 Ga. at 200 (4). At the new trial hearing, however, Croyle did not call as a witness the busser bar back who had testified as "Carlton Grace"; nor did Croyle otherwise make any pertinent showing that would have required the trial court to rule in his favor, in light of the trial testimony given by "Carlton Grace" (who hung around immediately after the incident and spoke with an officer). Consequently, we conclude that the trial court was authorized to conclude that Croyle had failed to

carry his burden of affirmatively demonstrating requisite prejudice.[16] See generally

*Pierce*, 286 Ga. at 200 (4).

(ii) Croyle complains that his trial lawyer did not *need* to stipulate that he

committed the acts, and that the stipulation was predicated upon her

misunderstanding of Georgia law. At the new trial hearing, Croyle's trial lawyer

testified to the following:

A: [I]n reading previous case law prior to trying this case . . . , it was
apparent to me that even though I might ask for an insanity charge

---

[16] See generally *Bostic*, 294 Ga. at 847 (1) (rejecting challenge to the sufficiency of the evidence on the ground that there "was no evidence of an aggravated assault on Hollinger, because the indictment named 'Latana Hollinger' as the victim, and when Hollinger testified, she gave her name as 'Latavia Hollinger'," because the testimony proved that the victim was "Latavia Hollinger," and it was clear that the two names referred to the same individual); *Tarvin v. State*, 277 Ga. 509, 510 (3) (591 SE2d 777) (2004) (explaining that where the indictment named the aggravated assault victim as "Wayne Lee David," but all the evidence established the victim to be "Wayne Lee Davis," no reversible error occurred because "[a]ll testimony proved that the victim was Wayne Lee Davis, and it [was] clear that the two names referred to the same individual); *Strozier v. State*, 277 Ga. 78, 80 (3) (586 SE2d 309) (2003) (rejecting contention that the trial court erred in failing to direct a verdict of acquittal as to the charge of aggravated assault on "Derek Jones" where the indictment named the victim as "Derek John," because the testimony made it clear that the two names referred to the same individual). Accord *Brown v. State*, 307 Ga. 24, 27 (1) (834 SE2d 40) (2019) ("Our courts no longer employ an overly technical application of the fatal variance rule, focusing instead on materiality. The true inquiry, therefore, is not whether there has been a variance in proof, but whether there has been such a variance as to affect the substantial rights of the accused.").

40

doesn't mean it – that the Court has to actually give it. And so, in trying to insure that my sole defense that particular charge would be given in front of the jury, I wanted to basically – that was one of the strategies of me stipulating.

. . .

Q: So at the time of Mr. Croyle's trial, what did you think that you had to have Mr. Croyle admit in order to get an affirmative defense?
A: That he did the offense.

Recently, in a decision issued in October 2019, the Supreme Court of Georgia clarified,

> [I]n order to raise an affirmative defense, a criminal defendant need not "admit" anything, in the sense of acknowledging that any facts alleged in the indictment or accusation are true. Rather, in asserting an affirmative defense, a defendant may accept certain facts as true for the sake of argument, and the defendant may do so for the limited purpose of raising the specific affirmative defense at issue.

*McClure v. State*, 306 Ga. 856, 863-864 (1) (834 SE2d 96) (2019). But Croyle was tried in September 2019. And at that time, numerous appellate decisions had held that "to assert an affirmative defense, a defendant must admit the act, or he is not entitled to a charge on that defense." (Citation and punctuation omitted.) *McLean v. State*, 297 Ga. 81, 83 (2) (772 SE2d 685) (2015); *Mangrum v. State*, 285 Ga. 676, 680 (6) (681

41

SE2d 130) (2009) ("An affirmative defense is a defense that admits the doing of the act charged but seeks to justify, excuse, or mitigate it. Accordingly, if a defendant does not admit to committing any act which constitutes the offense charged, he is not entitled to a charge on the defense of accident.") (citation and punctuation omitted); *Pennington v. State*, 346 Ga. App. 586, 591 (3) (816 SE2d 762) (2018); see also *McClure v. State*, 347 Ga. App. 68, 73-78 (815 SE2d 313) (2018) (McFadden, P. J., concurring in part and dissenting in part) (raising concerns about requirement that defendant admit act to obtain charge on affirmative defense).

Given the state of Georgia law on that issue at the time Croyle was tried, his complaint regarding his counsel's understanding of the law does *not* demonstrate deficient performance – i.e., that "his lawyer performed [her] duties in an objectively unreasonable way, considering all the circumstances and in the light of prevailing professional norms." (Citation and punctuation omitted.) *Neuman*, 311 Ga. at 96 (5); see *Debelbot v. State*, 305 Ga. 534, 542 (2) (826 SE2d 129) (2019) (noting that "[t]he reasonableness of counsel's conduct is examined from counsel's perspective at the time of trial and under the particular circumstances of the case") (citation and punctuation omitted); see generally *Reed v. State*, 307 Ga. 527, 535 (2) (b) (837 SE2d 272) (2019) ("Appellant's trial counsel was not deficient and thus was not ineffective

42

for failing to predict [an appellate decision].”); *Rhoden v. State*, 303 Ga. 482, 486 (2) (a) (813 SE2d 375) (2018) (explaining that “there is no requirement for an attorney to prognosticate future law in order to render effective representation,” and that “[c]ounsel is not obligated to argue beyond existing precedent”) (citations and punctuation omitted); *Washington v. State*, 271 Ga. App. 764, 765 (1) (610 SE2d 692) (2005) (“[T]he standard for effectiveness of counsel does not require a lawyer to anticipate changes in the law[.]”) (citation and punctuation omitted).

Moreover, Croyle has failed to establish requisite prejudice in regard to the stipulation. Croyle asserts that “the jury had no option but to convict him on all 21 of the aggravated assault counts because of the stipulation,” but the record makes clear that Croyle advanced an insanity defense. As we have set out above, when the trial judge relayed to the jurors the parties’ stipulation during the State’s case-in-chief, the trial judge specifically informed them that “Defense Counsel is reserving the defenses – defenses of insanity, mental illness and intellectual disability, which must be ultimately decided by you.” And later, during the final charge, the trial judge recited the stipulations, again reminding the jurors that “Defense counsel reserves the right to present a defense of insanity, mental illness and intellectual disability as to each count of the indictment which must be decided by the jury.” Further, during the final

charge, the trial judge tracked the pattern jury instructions for "Insanity at Time of Act (Right and Wrong)" as set out at 2 Ga. Jury Instructions - Criminal § 3.80.20, which included,

> If you believe beyond a reasonable doubt that the defendant committed the act charged in this bill of indictment but also believe by a preponderance of evidence that at the time of the commission of this act, the defendant was mentally incapable of distinguishing between right and wrong regarding this particular act, then it would be your duty to acquit the defendant because of insanity.

In addition to thus instructing the jurors on a possible verdict of "not guilty by reason of insanity," the court instructed the jurors on the other possible verdicts of not guilty, guilty beyond a reasonable doubt but mentally ill, and guilty beyond a reasonable doubt but with intellectual disability. Thereafter, the trial court sent out with the jury a preprinted verdict form that directed the jury to find, for each count of the indictment, whether Croyle was:

> ___ NOT GUILTY BY REASON OF INSANITY AT THE TIME OF THE CRIME;
> **OR**
> __ GUILTY BUT MENTALLY ILL AT THE TIME OF THE CRIME;
> **OR**
> __ GUILTY BUT WITH INTELLECTUAL DISABILITY;

44

**OR**

__ GUILTY;

**OR**

__ NOT GUILTY.

(Emphasis in original.) See generally *Cheddersingh v. State*, 290 Ga. 680, 682 (2) (724 SE2d 366) (2012) ("A preprinted verdict form is treated as part of the jury instructions which are read and considered as a whole in determining whether there is error.") (citation and punctuation omitted).

Hence, viewing the stipulation, together with the final charge as a whole, we conclude that "[t]he trial judge adequately and accurately charged the jury on the applicable law[,] and the jury was properly left to apply the law to the facts of the case." *Hampton v. State*, 272 Ga. 284, 287 (7) (527 SE2d 872) (2000). And "we presume that jurors follow the law." *Venturino v. State*, 306 Ga. 391, 400 (4) (830 SE2d 110) (2019). This contention thus fails to demonstrate prejudice for purposes of *Strickland*, supra. See generally *Anderson v. State*, 286 Ga. 57, 59 (5) (685 SE2d 716) (2009) (rejecting claim that language employed during final jury charge warranted reversal, because "[v]iewing the charge as a whole, . . . it [was] not reasonably likely that the jury misapprehended the State's burden of proof");

45

*Newsome v. State*, 355 Ga. App. 13, 18 (2) (842 SE2d 339) (2020) (concluding that no plain error was established, because the jury was given adequate instructions, including a preprinted verdict form, for determining the defendant's innocence or guilt).[17]

(iii) Croyle contends that the stipulation was unreasonable as it applied to the four aggravated assault victims who testified prior to the stipulation, asserting that it was "possible the jury could have acquitted" him on those counts. As Croyle more specifically argues, given those individuals' specific locations at the time in question, the jury might have concluded that they were neither in reasonable apprehension of immediately receiving a violent injury nor likely to receive a serious bodily injury.

As detailed above, three of those individuals were patrons in the dining area, and the fourth such individual was a server in the kitchen. By the time they testified, the State had already presented evidence that when Croyle first slammed the SUV into the restaurant's front door, several occupants stared in that direction; but when Croyle backed up and slammed the SUV into the front door a second time, all of the occupants rushed out of the building. Indeed, each of the four victims at issue here

---

[17] See *Roberts v. State*, 305 Ga. 257, 265 (5) (a) (824 SE2d 326) (2019) ("[T]he test for prejudice in the ineffective assistance analysis is equivalent to the test for harm in plain error review.") (citation and punctuation omitted).

testified that his/her attention was immediately drawn to the loud, crashing sound; and that upon realizing the source of that sound, he/she immediately fled the building. Croyle has cited nothing in the record indicating that any of those four individuals could have known: whether the SUV slamming into the front door would actually breach the door; the direction, speed, or distance the SUV would travel, if the SUV breached the front door; and/or the extent of direct or collateral injury he/she would sustain during the ensuing mayhem, as the SUV barreled about the interior of the restaurant. Hence, Croyle's assertion – that based on the specific locations of those four individuals at the time in question, it was "possible the jury could have acquitted" him of the four respective counts – falls short of establishing that the stipulation was unreasonable.[18]

All thing considered, at the point the stipulation was entered, the State had adduced testimony and recordings evincing that Croyle had planned to burn down the restaurant because he associated that location with his divorce and other losses; that he thus purchased containers of fuel at a gas station and put them in the SUV; that

_____

[18] See *Shields v. State*, 307 Ga. App. 830, 831, 834 (1) (a) (706 SE2d 187) (2011) (reciting that "[a] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," and that "[t]o overcome the presumption of professional reasonableness, [the appellant] must offer something more than mere speculation") (citation and punctuation omitted).

about 20 minutes later, he repeatedly crashed the SUV into the restaurant's front door in an attempt to drive the SUV into the restaurant; that all the individuals inside reacted by fleeing the building; that Croyle next made multiple trips into the restaurant – transporting and tossing about the dining and kitchen areas multiple propane tanks, aerosol cans, and open containers of fuel; and that he then set the building on fire. Croyle has cited nothing in the record (including the transcript of the new trial hearing) showing that the State would *not* have been able to continue with its parade of alleged victims to give their substantively similar accounts. Nor has Croyle demonstrated that his trial lawyer performed deficiently or that he was prejudiced by using the stipulation as a strategy to truncate the State's evidence and to preserve and channel the jurors' attention to his defense – that although he undeniably committed the acts, he lacked the criminal intent.

> While other counsel, had they represented appellant, may have exercised different judgment, the fact that trial counsel chose to try the case in the manner in which it was tried, and made certain difficult decisions regarding the defense tactics to be employed with which appellant and his present counsel now disagree, does not require a finding that the representation below was so inadequate as to amount to a denial of effective assistance of counsel.

(Citation and punctuation omitted.) *Cox v. State*, 306 Ga. 736, 740 (2) (a) (832 SE2d 354) (2019); see *Butler v. State*, 292 Ga. 400, 409 (3) (e) (738 SE2d 74) (2013) (concluding that the trial court correctly determined that the appellant had failed to carry his burden of proving ineffective assistance of trial counsel, given "the absence of evidence from which a finding of trial counsel's deficient performance could be made, coupled with [the appellant's] mere speculation concerning the prejudice purportedly wrought by the unproven deficient performance") (citation and punctuation omitted).

(b) *Jury Instruction*. Croyle complains that his trial lawyer did not request that the final charge include the following language from *Brown v. State*, 228 Ga. 215, 219 (3) (184 SE2d 655) (1971): "The act itself may be so utterly senseless and abnormal as to furnish satisfactory proof of a diseased mind."

Croyle has demonstrated neither deficient performance nor prejudice. As noted above, Croyle's trial lawyer expressed that it was her goal to have the jury fully instructed on the defense advanced, and pointed out that the exact language used in *Brown* was not included in any pattern instruction. And "the mere fact that language has been employed by the reviewing court in discussing a case or in giving reasons and argument for a particular decision does not always render such language

49

appropriate for use by the trial judge in charging the jury." (Citation and punctuation omitted.) *Morehead v. Morehead*, 227 Ga. 428, 430 (3) (181 SE2d 59) (1971).

"In reviewing a challenge to the trial court's jury instruction, we view the charge as a whole to determine whether the jury was fully and fairly instructed on the law of the case." (Citations and punctuation omitted.) *Russell*, 309 Ga. at 782 (3) (a). Here, the trial judge adequately and accurately charged the jury on the applicable law, and the jury was properly left to apply the law to the facts of the case. See *Bennett v. State*, 262 Ga. 149, 152 (7) (c) (414 SE2d 218) (1992) (rejecting claim that the trial court erred by refusing to charge the jury with language that "the act itself may be so utterly senseless and abnormal as to furnish satisfactory proof of a diseased mind to warrant a finding of insanity on the part of the defendant," where the court had given a sufficient charge on the insanity defense; explaining that "[t]o charge further as requested by the defendant would, under the circumstances, have been argumentative") (citation and punctuation omitted).[19]

---

[19] See generally *Rodriguez v. State*, 271 Ga. 40, 42 (1) (518 SE2d 131) (1999) ("[A] defendant may be found 'not guilty by reason of insanity at the time of the crime' if he meets the criteria of Code Section 16-3-2 [lacked mental capacity to distinguish between right and wrong in relation to the crime] or 16-3-3 [acted because of a delusional compulsion which overmastered defendant's will to resist committing the crime] at the time of the commission of the crime. OCGA § 17-7-131 (c) (1).") (brackets in original); *Stevens v. State*, 256 Ga. 440, 442 (350 SE2d 21) (1986) ("To

(c) Given the foregoing, Croyle has established no merit in his claim that he was deprived of effective assistance of trial counsel.

Although we have evaluated each claim separately, we also recognize that the effect of prejudice resulting from counsel's deficient performance is viewed cumulatively. To that end, we conclude that the cumulative prejudice from any deficiencies assumed [above] is insufficient to create a reasonable probability that the results of the proceedings would have been different in the absence of the deficiencies alleged.

---

support a finding that a defendant is not guilty of a criminal act under OCGA § 16-3-3, it must appear: (1) that the defendant was laboring under a delusion; (2) that the criminal act was connected with the delusion under which the defendant was laboring; and (3) that the delusion was as to a fact which, if true, *would have justified the act*.") (emphasis supplied).

Croyle has cited nothing that would have *justified* his acts of crashing the SUV into an occupied restaurant and/or setting the building on fire; Croyle has cited nothing in the trial transcript showing that his defense included delusional insanity; and the facts underlying this case are materially distinguishable from those underlying *Brown*. See generally *Duck v. State*, 250 Ga. 592, 596 (2) (a) (300 SE2d 121) (1983) (concluding that the trial court correctly refused to charge jury language from *Brown*, 228 Ga. at 219, that "the act itself may be so utterly senseless and abnormal as to furnish satisfactory proof of a diseased mind to warrant a finding of insanity on the part of the defendant"; explaining that *Brown* was factually distinguishable, and noting that "in *Brown* there was expert testimony which would have authorized the jury to find that the defendant was suffering from delusional insanity") (citation and punctuation omitted); *Johnston v. State*, 232 Ga. 268, 272 (4) (206 SE2d 468) (1974).

(Citation and punctuation omitted.) *Jackson v. State*, 306 Ga. 69, 90 (9) (829 SE2d 142) (2019).

3. Croyle claims that he is entitled to a new trial because of the combined prejudicial effect of the trial court's (alleged) errors: (i) allowing into evidence the complained-of expert testimony; and (ii) rejecting his ineffectiveness claim. See generally *State v. Lane*, 308 Ga. 10, 14 (1) (838 SE2d 808) (2020) ("Georgia courts considering whether a criminal defendant is entitled to a new trial should consider collectively the prejudicial effect of trial court errors and any deficient performance by counsel — at least where those errors by the court and counsel involve evidentiary issues.").

"When reviewing such a claim, we evaluate only the effects of matters determined to be error, not the cumulative effect of non-errors." (Citation and punctuation omitted.) *Cox*, 306 Ga. at 743 (2) (e). Having so reviewed Croyle's claim, we conclude that his claim lacks merit. See generally *Rawls v. State*, 310 Ga. 209, 224 (6) (850 SE2d 90) (2020); *Lyons v. State*, 309 Ga. 15, 26 (8) (a) (843 SE2d 825) (2020).

*Judgment affirmed. Gobeil and Markle, JJ., concur.*